**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ira SILVERMAN (90–3205); Morris G. Woodard (90–5816); and Gary Caton (90–5733/91–6506), Defendants–Appellants.**

Nos. 90–3205, 90–5733, 90–5816 and 91–6506.

United States Court of Appeals,
Sixth Circuit.

Reargued Feb. 12, 1992.

Decided Sept. 22, 1992.

John O. Braud, Asst. U.S. Atty., Columbus, Ohio, Gregory G. Lockhart (briefed), Office of the U.S. Atty., Dayton, Ohio, and Sean Connelly (argued and briefed), U.S. Dept. of Justice, Civ. Div., Kenneth W. Starr (argued), Office of the Sol. Gen., Washington, D.C., for U.S. in No. 90–3205.

David H. Bodiker (argued and briefed), Bodiker & Holland, Columbus, Ohio, for Ira Silverman.

Paul Borman, Fed. Public Defenders Office, Detroit, Mich., Edward Marek, Fed. Public Defender (argued and briefed), Cleveland, Ohio, Leah J. Prewitt, Knoxville, Tenn., Edward C. Duke, Fed. Public Defender, Memphis, Tenn., Henry A. Martin, Fed. Public Defender, Nashville, Tenn., for amicus curiae Federal Public and Community defenders.

Louis DeFalaise, U.S. Atty., John M. Compton, Asst. U.S. Atty., Mark A. Wohlander, Asst. U.S. Atty. (briefed), Lexington, Ky., Sean Connelly, U.S. Dept. of Justice, Civ. Div., Kenneth W. Starr (argued), Office of the Sol. Gen., Washington, D.C., for U.S. in No. 90–5733.

Douglas L. McSwain (argued and briefed), Ogden, Sturgill & Welch, Lexington, Ky., for Gary Caton.

Louis DeFalaise, U.S. Atty., John M. Compton, Asst. U.S. Atty. (briefed), Lexington, Ky., Sean Connelly (argued and briefed), U.S. Dept. of Justice, Civ. Div., Kenneth W. Starr (argued), Office of the Sol. Gen., Washington, D.C., for U.S. in No. 90–5816.

Kevin G. Henry (argued and briefed), Ogden, Sturgill & Welch, Lexington, Ky., for Morris Gordon Woodard.

John M. Compton, Asst. U.S. Atty., Karen K. Caldwell, U.S. Atty., Mark A. Wohlander, Asst. U.S. Atty., Lexington, Ky., Sean Connelly (briefed), U.S. Dept. of Justice, Civ. Div., Washington, D.C., for U.S. in No. 91–6506.

Before MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, MILBURN, GUY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, Circuit Judges; and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

Defendants, Ira Silverman, Gary Caton, and Morris Woodard, have appealed from their guidelines sentences received by reason of guilty pleas to possession with intent to distribute drugs. The Chief Judge directed that their separate appeals be consolidated because he determined that "they involve similar legal questions under the Confrontation Clause."[1] In each case, the sentencing judge increased the sentence imposed beyond that which reflected the quantity of drugs involved in the particular count or counts to which the defendant had pleaded guilty. The sentence in each case reflected other drug activity of the particular defendant based upon hearsay testimony or evidence, and this activity was found by a preponderance of the evidence by the district court to be "relevant conduct." This relevant conduct determination was the basis for the sentences imposed, which are the subject of these consolidated appeals. Although it is uncertain whether each of the defendants raised the confrontation issue in a timely manner, we discuss the contentions of each defendant separately and the applicable circumstances in his particular case. We AFFIRM each of the sentences.

## I. IRA SILVERMAN

The saga of Silverman in the federal courts began in 1988, when he was arrested after attempting to sell cocaine to an

---

1. *United States v. Silverman*, Nos. 90–3205/ 5733/5816, slip op. at 1, 1991 WL 179608 (6th Cir.1991) (vacated). The Sixth Amendment to the U.S. Constitution provides, in pertinent part:

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

informant. The indictment charged him with intent to distribute cocaine and with a separate count of travel in interstate commerce to promote a narcotics business. Under a plea agreement, Silverman pleaded guilty only to the cocaine distribution charge. In an initial appeal, the issues were the constitutionality of the Federal Sentencing Guidelines ("guidelines"), the burden of proof on establishing guideline elements, the district court's consideration of past activities involving drugs—found to be relevant conduct under the guidelines (§ 1B1.3)—Silverman's role in the offense, and whether the government adhered to the plea agreement. We remanded the case (Guy, J., dissenting) to direct the district court to consider the effect of Silverman's plea agreement, specifically asking whether the court accepted the agreement and whether its intent had been carried out in the sentence. *United States v. Silverman,* 889 F.2d 1531, 1539 (6th Cir.1989). We cited, in connection with the remand, *United States v. Smith,* 887 F.2d 104 (6th Cir.1989), which held:

In its sentencing determination, the district court should have considered all conduct that was part of the same course of conduct or a common scheme or plan as the offense of conviction-including possession of the drugs charged in Count Two [the dismissed count].

We note that due process requires that *some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of such conduct as relevant to sentencing. "[A]s a matter of due process, factual matters may be considered as a basis for sentence only if they have some minimal indicium of reliability beyond mere allegation." *United States v. Baylin,* 696 F.2d 1030, 1040 (3d Cir.1982); *see also Williams v. Oklahoma,* 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959). This due process limit on the evidence a sentencing court may properly consider is recognized in the commentary to § 6A1.3 of the guidelines, which provides:

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.

Any information may be considered, so long as it has *"sufficient indicia of reliability to support its probable accuracy."* Reliable hearsay evidence maybe considered. Out-of-court declarations by an unidentified informant may be considered "where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means." Unreliable allegations shall not be considered.

*Guidelines Manual* at 6.2 (1987) (citations omitted; emphasis added).

Therefore, we reverse the district court's sentencing of defendant and remand this case for resentencing with the instruction that all conduct that formed part of defendant's criminal course of conduct, scheme or plan, including possession of the drug quantities charged in the dismissed count, ....

*Id.* at 108–109 (footnote omitted). *Smith* reversed the district court's failure to consider the defendant's drug activity in the count of the indictment which was dismissed pursuant to a plea agreement.

We also directed that the district court clarify its finding on Silverman's role in the offense, noting that the court had not indicated whether it had found five or more participants as required for a three-point enhancement. Finally, the panel directed the district court to "indicate its reasons for rejecting the motion for withdrawal of the guilty plea." *Silverman,* 889 F.2d at 1540. There was no reference whatever in our previous opinion to the Confrontation Clause, nor did Silverman make any such direct contention in his brief or at argument.

In the original opinion, we noted Silverman's position as opposing:

consideration by the court of his past history of alleged extensive drug dealing. Defendant sought to limit consideration of evidence only to that "admissible at trial" and that proof on factors relevant to the offense level be required by "clear and convincing evidence." He also sought to limit the sentencing hearing matters to allegations previously set forth in the presentence report (not the

supplemental material later presented). He sought a ruling that he could testify in response to any such evidence without waiving his fifth amendment privilege. If the ruling were adverse to defendant's motions in this regard, Silverman sought to withdraw his guilty plea.

The district court did not specifically rule on these matters, but it did consider a later memorandum on past history of relevant conduct, dated August 19, 1988, which related to information concerning (1) investigation of Silverman by other authorities of earlier cocaine distribution, (2) a purported list of drug dealers in Silverman's handwriting obtained in a search of the limousine, (3) Silverman's posting while a college student of a $10,-000 cash bond in less than two hours in 1987, and (4) a November, 1987 cocaine transaction "with Silverman underlings [which] involved 93% pure cocaine."

*Silverman*, 889 F.2d at 1537.

The district court reiterated its findings on Silverman's past relevant drug conduct in the opinion on remand:

This court concluded from the evidence presented at the sentencing hearing and in the presentence investigation report that defendant was a drug dealer of significant proportion, and that his drug distribution activities spanned a period of several months prior to his arrest in February of 1988. These activities included his distribution of the kilogram of cocaine in August of 1987, as well as cocaine distribution activities as early as June of that year which were reported by the government informant. The evidence also indicated that defendant was involved in drug distribution activities at Ohio University in Athens, Ohio during or prior to this period.

Upon further consideration of the sentencing information before the court, this court reaffirms its previous factual determination that the August, 1987 sale of one kilogram of cocaine was a part of the same ongoing course of conduct or common scheme or plan as defendant's drug activities which formed the basis for the February 15, 1988 offense of conviction. Indeed, as this court previously noted, the debt created by the August distribution of cocaine played a role in the events of February 15, 1988.

In addition, the district court concluded after further consideration on remand:

The court concludes that no promises were made to defendant that consideration of other activities as relevant conduct would be precluded, and that defendant had no basis for any expectation that the court could not consider that information.

The court concludes that there are no circumstances present in this case which would distinguish it from the result in *United States v. Ykema*, 887 F.2d 697 (6th Cir.1989) [, *cert. denied*, 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990) ].

In their appellate briefs to this court on this second appeal, the parties did not cite the Confrontation Clause or the Sixth Amendment. Silverman did object, however, to the hearsay nature of some evidence or information. Silverman's appellate brief, moreover, acknowledged numerous cases holding that "drugs that were not part of the offense of conviction must be included in the amount used to compute the base offense score" under the guidelines. He claimed, rather than a confrontation violation, that the "record" did not support the district court's findings.[2] Regardless of whether we consider Silverman's due process contention as a "Confrontation Clause" matter,[3] we deal with the district court's treatment of hearsay evidence.

---

**2.** Silverman does mention a "constitutional due process right" to the effect "that facts used for sentencing must have 'some minim[al] indicium of reliability beyond mere allegation.'" (*Quoting Smith*, 887 F.2d at 108.)

**3.** Chief Judge Merritt himself injected the confrontation issue in these cases in the first instance. Indeed, we would not have analyzed the Confrontation Clause had we examined only the issues properly raised by the parties below. "[O]rdinarily a party may not present a Confrontation Clause objection for the first time on appeal." *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1087, 112 L.Ed.2d 1192 (1991) (citing *United States v. Gomez*, 810 F.2d 947, 954 (10th

We conclude that the district court, 730 F.Supp. 1418 (1990), was not in error in its reconsideration of the issues remanded to it, including the reduction based on Silverman's reduced role as manager. We reiterate, without setting forth in additional detail, the findings indicated as supported by evidence in the opinion in the original appeal. We find the supplemental findings made on remand by the district court are also supported by evidence with at least "some minimum indicia of reliability." We also conclude, for the reasons hereinafter set forth, that Silverman's Confrontation Clause rights, as well as his due process rights, were not violated in the district court's determination of other relevant drug conduct after consideration of the presentence report, testimony by DEA agent Robins, a supplemental memorandum submitted to the district court on sentencing, the opportunity of defendant to present witnesses or to ask for a recess or continuance if surprised, and argument of counsel.

## II. GARY CATON

Gary Caton was indicted by a grand jury on three counts charging him with three violations of 21 U.S.C. § 841(a) for illegal distribution, and possession with intent to distribute cocaine. The charges arose from three undercover government purchases of cocaine from Caton in 1989. Those purchases included two transactions totalling one-eighth ounce of cocaine sold to a confidential informant; the sale of one-quarter ounce from Caton's car repair shop a few days later to the informant; and the sale of two ounces, again at the repair shop, to an undercover government agent about a month later. Caton pleaded guilty to all three charges. Probation Officer Mason prepared a presentence report following Caton's guilty plea. After Caton made numerous objections to the report, a number of paragraphs from the presentence report were deleted.

The district court held an evidentiary hearing on the issue of whether certain alleged prior criminal activities mentioned in the presentence report were "relevant

conduct" within the meaning of Guidelines § 1B1.3(a)(1). The conduct relied upon by the probation officer involved 16 to 56 kilograms of cocaine that were apparently processed through Caton's home with Caton's knowledge in conjunction with several drug rings including one led by Morris Woodard. The court held that "[t]he definition of relevant conduct requires a link between the past conduct and the count of conviction. In this case the other activities are too remote, in time, involvement and character, to meet this standard." At the end of the hearing, however, the district court indicated that it was considering an upward departure.

Caton was sentenced on the basis of an offense level of fourteen and a criminal history category of six to imprisonment for forty-six months with three years' supervised release and a $150 special assessment. The court found that an upward departure from the recommended criminal history category to the next higher level would result in too lenient a sentence. The court stated:

> [T]his Court has examined the next highest criminal history category and feels that it is too lenient in this situation. The next highest criminal history category would be a two, which would call for an 18 to 24–month range. And in the opinion of this Court this is simply not enough time considering the nature and the extent of the defendant's past conduct.
>
> . . . .
>
> So based upon the defendant's conduct as documented in the presentence report and supplemented in the evidentiary hearing, the Court will depart above the applicable guideline range.
>
> . . . .
>
> I think departing anything lower than the category six would result in a sentence which is not serious—severe enough. I think this is a case which requires a serious sentence. And I took it a step at a time. I went from three to

Cir.), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987)).

four to five until I felt comfortable with six.

(Citing *United States v. Kennedy*, 893 F.2d 825 (6th Cir.1990)). The court's determination was based on the fact that Caton was a "player" in the distribution of large amounts of cocaine.[4] The court relied on information from the presentence report, the Kentucky State Police, an identified witness, a confidential informant, and Caton himself. Caton objected to use of the information from the confidential informant because he felt he should have had the opportunity to learn the informant's identity and test the reliability of the informant's testimony by cross-examination. The discussion of the confrontation issue also relates to defendant Woodard, and we also set out the factual setting as to Woodard before beginning our analysis.

### III. MORRIS WOODARD

Woodard was sentenced pursuant to the guidelines for conspiracy to possess cocaine with intent to distribute involving two kilograms in violation of 21 U.S.C. § 846. Woodard pleaded guilty to the charge in exchange for the government's agreement not to seek enhancement above guidelines level twenty-eight. The plea agreement notified Woodard that he faced up to forty years imprisonment and that the ultimate sentence was within the district court's discretion.

The conduct to which Woodard pleaded guilty involved the purchase from a confidential informant of one to two kilograms of cocaine. Woodard was arrested by the Kentucky State Police at his tobacco warehouse following a meeting with the confidential informant at which Woodard was prepared to purchase one or more kilograms for $22,000 per kilogram. Most of the negotiations were conducted by Woodard's nephew, Sims, but Woodard provided the money for the cocaine.

The presentence report indicated that Woodard had been involved with two groups of cocaine dealers, one of which included defendant Caton. The report rec-

ommended a four-point enhancement based on Woodard's role in the offense and did not recommend a two-point reduction for acceptance of responsibility. Woodard requested access to the notes and memoranda used by the probation officer in preparing the report, but the court denied his request.

The government indicated that it would offer evidence at a hearing in support of a two (not four) level increase based on Woodard's role and that it would oppose a two-level decrease for acceptance of responsibility. The district court twice offered Woodard the opportunity to withdraw his plea, but Woodard declined.

The district court found that Woodard was the dominant figure in the transaction, that he had used Sims as a buffer, that he made false statements about his role stating he was only a simple money lender, and that he had also falsified the facts about his intentions to sell the cocaine. On this basis the district court enhanced the base level two points to thirty and refused to reduce it for acceptance of responsibility. The court then sentenced Woodard to 121 months imprisonment.

### IV. THE CONFRONTATION ISSUE

Before entering into its analysis of the Confrontation Clause, the dissent argues that this court should not treat "the 'relevant conduct' provisions as sentencing 'imperatives.'" We choose not to address this argument, which has *never* been raised in these cases, since our recent decision in *United States v. Davern*, 970 F.2d 1490 (6th Cir.1992) (en banc), rejected the same contentions urged by the dissent.

 Defendants argue that a criminal defendant is entitled to trial-like procedural protections at sentencing in order to challenge the accuracy of presentence reports or other information developed for the edification of the sentencing judge. This argument appears to be predicated upon a theory that *all* things relative to sentencing have completely changed under the

---

**4.** As noted, the court earlier had determined that this evidence would not be considered "rel-

evant conduct" for purposes of increasing the base level offense.

guideline procedures. While a number of considerations have changed, we are of the view that the permissible methods of informing the sentencing judge and the need for information in fashioning sentences in light of the constitutional rights of defendants at sentencing have not essentially changed. The standard has always been that a sentence may not properly be imposed on the basis of material misinformation, *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980), but specific procedures, such as are required at trial, are simply not constitutionally mandated, especially when a guilty plea is entered. *See, e.g., Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969) ("A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.").

In *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) the Supreme Court considered the proper application of the rules of evidence to sentencing procedures. The Court upheld New York law which allowed a judge to consider evidence obtained from outside the courtroom without confrontation or cross-examination in exercising the judge's discretion to impose the death penalty. The Court considered the appellant's due process claim and the effect of the policy that "no person shall be tried and convicted of an offense unless he is given reasonable notice of the charges against him and is afforded an opportunity to examine adverse witnesses." *Id.* at 245, 69 S.Ct. at 1082 (footnote omitted). The court rejected the appellant's request for trial-like procedural protections on both historical and practical grounds.

> [B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.

*Id.* at 246, 69 S.Ct. at 1082 (footnote omitted); *see also Williams v. Oklahoma*, 358 U.S. 576, 583–86, 79 S.Ct. 421, 425–27, 3 L.Ed.2d 516 (1959). The Supreme Court recognized and permitted the use of affidavits and judges' personal knowledge in sentencing offenders, and noted as well that Rule 32 of the Federal Rules of Criminal Procedure provided that federal judges have access to reports made by probation officers. *Williams v. New York*, 337 U.S. at 246, 69 S.Ct. at 1082.

In *Williams*, the Court concluded:

> [a] sentencing judge ... is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant— if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.

*Id.* at 247, 69 S.Ct. at 1083 (footnote omitted). The Court noted the singular value of probation presentence reports to this gathering of information process.

> We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life. The type and extent of this information make *totally impractical* if not impossible open court testimony with *cross-examination*. Such a procedure could *endlessly delay criminal administration* in a retrial of collateral issues.

*Id.* at 250, 69 S.Ct. at 1084–85 (footnote omitted; emphasis added).

We have acknowledged the wide discretion allowed a trial judge in considering the evidence submitted at sentencing. *See, e.g., United States v. Hill*, 688 F.2d 18, 20 (6th Cir.) *cert. denied*, 459 U.S. 1074, 103 S.Ct. 498, 74 L.Ed.2d 638 (1982) (sentencing

court may consider presentence report information "notwithstanding the fact that [defendant] has never been prosecuted or convicted for any prior criminal activity"), *Humphries v. Green*, 397 F.2d 67, 70 (6th Cir.1968).

The sentencing court's use of hearsay information has traditionally been almost unlimited. *United States v. Maddalena*, 893 F.2d 815, 820 (6th Cir.1989). For instance, "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all," *McMillan v. Pennsylvania*, 477 U.S. 79, 91, 106 S.Ct. 2411, 2419, 91 L.Ed.2d 67 (1986) (citing *Williams*, 337 U.S. at 241, 69 S.Ct. at 1080), even when the presentence report was not furnished to defendants. *See* Fennel & Hall, *Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts*, 93 Harv.L.Rev. 1615, 1617 (1980). One court, in reviewing the history of sentencing, has stated, "virtually no limitations were placed on what a court could consider at sentencing and it was clear that reliance on *uncorroborated* hearsay was permissible." *United States v. Bowman*, 926 F.2d 380, 381 (4th Cir. 1991) (emphasis added; footnote omitted).

Judge Breyer, a member of the Sentencing Commission, describes the result of the Sentencing Commission's work as follows:

> A sentencing guideline system must have some real elements, but not so many that it becomes unwieldy or procedurally unfair. The Commission's system makes such a compromise. It looks to the offense *charged* to secure the "base offense level." It then modifies that level in light of several "real" aggravating or mitigating factors, (listed under each separate crime), several "real" general adjustments ("role in the offense," for example) and several "real" characteristics of the offender, related to past record.

Breyer, *The Federal Sentencing Guidelines And The Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1, 11–12 (1988) (footnotes omitted). The creation of this hybrid system was formally recognized by the Commission itself. U.S.S.G. Ch. 1, Pt. A, intro. 4(a), comment.

Relevant conduct, criminal history, and role in offense are examples of the real aspects of the sentencing guidelines. Procedural requirements for establishing the factual basis of sentencing, akin to the real offense aspects of pre-guideline sentencing, continue from former sentencing practices. *See e.g.*, Breyer, *supra* at 10; LaFave & Israel, *Criminal Procedure* § 25.1 (Supp. 1990) (acknowledging that guidelines do not require a trial-type evidentiary hearing); Hutchison & Yellen, *Federal Sentencing Law and Practice* 406 (1989) ("The Federal Rules of Evidence, by their own terms, do not apply to the sentencing phase of a case. The Sentencing Reform Act did not alter that."). According to one commentator:

> The relevant-conduct principle and cross-references between guidelines often work to ensure that the offense level is based on the actual offense behavior. For offenses like drug trafficking, theft, fraud, or tax evasion, conduct from uncharged or dismissed counts is often aggregated through application of the relevant conduct guideline section, 1B1.3(a)(2)....

> . . . . .

> Amendments promulgated since the original guidelines, and new proposals being considered in 1992, move the guidelines further toward a real-offense system.

Paul J. Hofer, *Plea Agreements, Judicial Discretion, And Sentencing Goals*, FJC DIRECTIONS, No. 3, May 1992, at 3.

Amended Fed.R.Crim.P. 32 deals with "sentence and judgment:"

**Sentence and Judgment**

**(a) Sentence.**

 **(1) Imposition of sentence.** ... At the sentencing hearing, the court shall afford the counsel for the defendant and the attorney for the Government an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence. Before imposing sentence, the court shall also—

**(A)** determine that the defendant and defendant's counsel have had the opportunity to read and discuss the presentence investigation report....

**(B)** afford counsel for the defendant an opportunity to speak on behalf of the defendant; and

**(C)** address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence. The attorney for the Government shall have an equivalent opportunity to speak to the court.

....

**(c) Presentence Investigation.**

**(1) When Made.** A probation officer shall make a presentence investigation and report to the court before the imposition of sentence....

**(2) Report.** The report of the presentence investigation shall contain—

**(A)** information about the history and characteristics of the defendant, including prior criminal record, if any, financial condition, and *any circumstances affecting the defendant's behavior that may be helpful in imposing sentence* or in the correctional treatment of the defendant.

**(B)** the classification of the offense and of the defendant under the categories established by the Sentencing Commission pursuant to section 994(a) of title 28, that the probation officer believes to be applicable to the defendant's case; the kinds of sentence and the sentencing range suggested for such a category of offense committed by such a category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1); and *an explanation by the probation officer of any factors that may indicate that a sentence of a different kind or of a different length from one within the applicable guideline would be more appropriate* under all the circumstances.

....

**(3) Disclosure.**

**(A)** At least 10 days before imposing sentence, unless this minimum period is waived by the defendant, the court shall provide the defendant and the defendant's counsel with a copy of the report of the presentence investigation,.... The court shall afford the defendant and the defendant's counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

....

**(D)** If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

(Emphasis added).

■ This amended rule allows a greater disclosure of presentence reports to the defendant, but reliance upon these reports is still contemplated without the full panoply of trial procedures available to a defendant at trial. In short, confrontation rights do not apply in sentencing hearings as at a trial on the question of guilt or innocence. When defendants have pleaded guilty, as in this case, sentencing does not mandate confrontation and cross-examination on information submitted to the court through the presentence reports and law enforcement sources. Following the mandates of Fed. R.Crim.P. 32 is constitutionally sufficient because they are fundamentally fair and afford the defendant adequate *due process* protections.

Rule 32(c)(3)(A) affords defendants the opportunity "to introduce testimony or other information" at the sentencing hearing. Presentence reports frequently contain hearsay information from confidential and unidentified sources. In the event of controversy concerning the accuracy of the presentence report, Rule 32(c)(3)(D) mandates that the sentencing judge either make a finding or disregard the contested

matter in arriving at a sentence. Rule 32, as amended, clearly applies to required procedures under the sentencing guidelines. *See United States v. Blanco,* 888 F.2d 907 (1st Cir.1989). The rule is silent as to the application of the Confrontation Clause. Hearsay information submitted through law enforcement sources, or otherwise, and incorporated into a presentence report may be attacked or impeached by the defendant in a number of ways without requiring confrontation of underlying sources, which may involve confidentiality, security and personal safety.

■ Since the adoption of the sentencing guidelines, there has been *no change* in this basic statutory guide to sentencing:

**Use of information for sentencing**

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3577. Under that section and based on principles discussed, the law has long been established that various types of hearsay information may be considered by the sentencing judge. *See United States v. Garcia,* 725 F.2d 52 (6th Cir.1984); *United States v. Burton,* 631 F.2d 280 (4th Cir.1980); *United States v. Marshall,* 519 F.Supp. 751 (E.D.Wis.1981), *aff'd,* 719 F.2d 887 (7th Cir.1982). It is the law that even illegally obtained or other inadmissible evidence may be considered by the sentencing judge unlike at a trial involving guilt or innocence. *See United States v. Baylin,* 696 F.2d 1030 (3d Cir.1982); *Hill,* 688 F.2d at 20; *Smith v. United States,* 551 F.2d 1193 (10th Cir.), *cert. denied,* 434 U.S. 830, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977); *United States v. Williamson,* 567 F.2d 610 (4th Cir.1977); *United States v. Lee,* 540 F.2d 1205 (4th Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). Such information, on the other hand, may not be admitted at trial concerning guilt or innocence because of Fifth and Sixth Amendment concerns. The long-established principle in all of these cases, both before and after adoption of the Guidelines, is that the constitutional protections afforded defendants at a criminal trial, including confrontation rights, are not available at sentencing proceedings to limit the court's consideration of the background, character and conduct of the defendant.

So long as the evidence in the presentence report bears "some minimal indicia of reliability in respect of defendant's right to due process," the district court, after adoption of the guidelines, may still continue to consider and rely on hearsay evidence without any confrontation requirement. *United States v. Herrera,* 928 F.2d 769 (6th Cir.1991); *United States v. Robinson,* 898 F.2d 1111, 1115 (6th Cir.1990); *United States v. Giltner,* 889 F.2d 1004, 1007 (11th Cir.1989); *United States v. Smith,* 887 F.2d 104 (6th Cir.1989).

In *Robinson,* we relied upon *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, and *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). In reaching its decision, the *Robinson* court quoted the *Tucker* language: "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Tucker,* 404 U.S. at 446, 92 S.Ct. at 591. *See also* 18 U.S.C. § 3577; *United States v. Castellanos,* 904 F.2d 1490 (11th Cir.1990); *Blanco,* 888 F.2d at 907.

Under the Sixth Amendment a defendant has the right: (1) "to a speedy and public trial"; (2) to trial "by an impartial jury"; (3) "to be informed of the nature and cause of the accusation"; (4) to "compulsory process for obtaining witnesses in his favor," as well as confrontation of witnesses; and (5) to "assistance of counsel." Many of these rights, applicable at trial, are not applicable to the sentencing process. (Speedy trial, jury trial, and confrontation rights are among those in the latter category).

In addition, *United States v. Bronaugh,* 895 F.2d 247 (6th Cir.1990), and *United States v. Miller,* 910 F.2d 1321 (6th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991), upheld a sen-

tencing court's factual finding and sentence based largely on uncharged drug conduct. (Chief Judge Merritt, dissenting in *Miller,* unsuccessfully asserted Sixth Amendment limitations). *See also United States v. Mocciola,* 891 F.2d 13, 16 (1st Cir.1989).

The right to be informed of the nature and the full extent and implications of criminal charges is deemed essential for the trial process, but applies in sentencing only if an entirely new and more serious charge is added at sentencing without notice or "any 'hearing in the normal sense.'" *See Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326 (1967), *as described in McMillan,* 477 U.S. at 88–89, 106 S.Ct. at 2417.

In *Robinson,* we discussed the type of evidence made available and relied upon customarily in *post*-guidelines sentencing hearings, the very type of evidence considered by the trial judge in each of the cases now under consideration in this appeal.

Title 18, U.S.C. § 3577, states that "[n]o limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Courts have noted that "this statute was enacted in order to clearly authorize the trial judge to rely upon information of alleged criminal activity for which the defendant had not been prosecuted...." *Smith v. United States,* 551 F.2d 1193, 1196 (10th Cir.), *cert. denied,* 434 U.S. 830, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977) (citing *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *Williams v. People of the State of New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)). "[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker,* 404 U.S. at 446, 92 S.Ct. at 591, *quoted in Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980). *See also*

*Alabama v. Smith,* [490 U.S. 794], 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). Sentences imposed on the basis of material misinformation under some circumstances, however, may violate due process. *Roberts,* 445 U.S. at 556, 100 S.Ct. at 1362.

> *The district court may consider hearsay evidence in determining sentence, but the accused must be given an opportunity to refute it,* and the evidence must bear some minimal indicia of reliability in respect of defendant's right to due process. *United States v. Rodriguez,* 765 F.2d 1546, 1555 (11th Cir.1985); *United States v. Otero,* 868 F.2d 1412 (5th Cir.1989). In challenges to the evidence considered by the sentencing judge, the *defendant must establish that the challenged evidence is materially false* or unreliable, and that such false or unreliable information actually served as the basis for the sentence. *Rodriguez, supra.*

*Robinson,* 898 F.2d at 1115–16 (emphasis added).

The guidelines themselves provide that "the [sentencing] court may consider relevant information without regard to its admissibility under the rules of evidence *applicable at trial,* provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3 (emphasis added). The defendant in each of these cases on appeal was given "an opportunity to refute" information in the presentence report or from law enforcement sources. In each instance, the sentencing judge found the evidence sufficiently reliable to support a proper preponderance of evidence finding.

In *Herrera,* the defendant made the same type of objection made by Silverman, Caton, and Woodard about unreliability of the presentence report. This court overruled Herrera's argument:

> We note that due process requires that *some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of such conduct as relevant to sentencing. "[A]s a matter

of due process, factual matters may be considered as a basis for sentence only if they have some minimal indicium of reliability beyond mere allegation." *United States v. Baylin,* 696 F.2d 1030, 1040 (3d Cir.1982); *see also Williams v. Oklahoma,* 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959). This due process limit on the evidence a sentencing court may properly consider is recognized in the commentary to § 6A1.2 of the guidelines, which provides:

"In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered, so long as it has *'sufficient indicia of reliability to support its probable accuracy.'* Reliable hearsay evidence may be considered. Out-of-court declarations by an unidentified informant may be considered 'where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means.' Unreliable allegations shall not be considered."

*Guidelines Manual* at 62. (1987) (citations omitted; emphasis added).

*Herrera,* 928 F.2d at 773 (citing language from *United States v. Smith,* 887 F.2d at 108).

■ Thus, this court, in the recent past, in *Smith, Robinson,* and *Herrera,* has upheld the procedures at sentencing utilized by the district courts in these consolidated appeals. In each case, the guidelines procedure, as well as the traditional procedure in sentencing matters, permits hearsay, even "second hand" hearsay, from informants and unidentified sources in presentence reports, *without confrontation,* if the district court finds it to have "sufficient or minimally adequate" indicia of reliability. Judge Martin stated specifically:

This issue has already been resolved against Herrera by this circuit in *United States v. Smith,* 887 F.2d 104 (6th Cir. 1989), where we held that conduct beyond that alleged in the indictment may be considered as long as there is a minimum indication of its reliability: "[a]ny information may be considered, so long

as it has *'sufficient indicia of reliability to support its probable accuracy.'* " *Id.* at 108 (citation omitted).

*Herrera,* 928 F.2d at 774 (emphasis in original).

Our decision reiterates what this court has consistently held—that relevant conduct proof must be found to have "sufficient indicia of reliability to support its probable accuracy" as a matter of due process protection. *Smith,* 887 F.2d at 108. *See also,* in particular, *Herrera,* 928 F.2d at 773, and *Robinson,* 898 F.2d at 1115. The Supreme Court has emphasized the breadth of information available to the district court at sentencing. It is simply incorrect, therefore, to state, as does Chief Judge Merritt in his dissent, that we hold that "constitutionally reliable evidence of the unconvicted crime is unnecessary." We have applied the preponderance of the evidence standard long adopted by this court and supported by virtually unanimous authority.

The dissenters conclude that the sentencing judge in the *Silverman* case committed clear error, based on "triple hearsay," in finding the relevant conduct evidence sufficiently reliable to add drug quantities to the amount involved in the offense to which he pleaded guilty for sentencing purposes. The district court found substantially as indicated in Silverman's presentence report:

In October of 1987, he learned from a confidential informant that the informant had been obtaining cocaine from defendant during the summer of 1987 for the purpose of selling it. The informant reported that in July and August of 1987, defendant gave a kilogram of cocaine to the informant and a co-conspirator, identified as James Michael Mourning, for the purpose of selling it. They had a hard time selling that quantity of cocaine and collecting from their distributors, and ended up owing money to defendant. The informant's information was corroborated by Mike Mourning upon his arrest on February 15, 1988. Mike Mourning told Agent Robins that he had been selling cocaine for defendant for two to

three years and that he had been involved in the distribution of the kilogram of cocaine. Mike Mourning also stated that he had gone to New York on two occasions and obtained a half pound of cocaine from defendant each time. He stated that defendant owned the safe which was kept at the Mourning address.

*Silverman*, 889 F.2d at 1533, 1534. In addition, the district court found, based on what he also deemed to be established by sufficient indicia of reliability:

> Defendant admitted to the probation officer that he was going to Athens, Ohio that day to attempt to sell the cocaine, and that he had been involved previously in drug related activities in Athens and Meigs Counties.

*Id.* at 1533.

This evidence of admissions, statements of co-conspirators (against their interest), and police investigation does not constitute "triple hearsay," nor does it constitute "hearsay three and four levels deep" in any of these cases as mistakenly characterized by the dissenters.

We expressly reject the sole authority to the contrary, *United States v. Fortier*, 911 F.2d 100 (8th Cir.1990). *Fortier* held that in order to require that "the government make its proof in a reliable fashion" at sentencing, it would impose a confrontation requirement based on the unusual factual situation involved.[5] In that case, however, the appellate court found that the district court made, or could make, "[n]o finding of reliability." *Id.* at 103.[6]

We cite with approval from among a plethora of cases from other circuits that conform to our conclusion on the inapplicability of the Confrontation Clause to the sentencing procedure. *See, e.g., United States v. Lopez*, 898 F.2d 1505, 1512 (11th Cir.1990); *United States v. Beaulieu*, 893 F.2d 1177, 1180 (10th Cir.1990); *Giltner*, 889 F.2d at 1007; *United States v. Agyemang*, 876 F.2d 1264, 1271 (7th Cir.1989); *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir.1989).

Caton's specific Confrontation issue was that the government attorney *ex parte* referred to hearsay information from a "confidential informant" source, and a principal government witness at the sentencing hearing gave testimony about "alleged reliability" of the informant.

The district court considered a full presentence report, a 12–page presentencing

5. The presentence report in *Fortier* indicated that "a confidential informant had told the [DEA] agent that a third person said the drugs belonged to Fortier." *Id.* at 103. In addition, the "reference to the taped [account was] ambiguous," and the transcript was not presented at the sentencing hearing. A strong argument can be made that the confrontation requirement was introduced in that case simply because there were no demonstrated indicia of reliability concerning the "triple hearsay" statement not supported by a tape or any other proof, and no reliability was apparent or indicated. *Id.*

6. Chief Judge Lay, one of the panel members in *Fortier*, seemed to emphasize the unusual feature of triple hearsay in that case in a later opinion. He referred to the apparently applicable general rule that affords defendants a chance to explain or rebut hearsay presentence report information, rather than a confrontation right, when there are some indicia of reliability in the information supplied the court:

> Generally, a sentencing court may consider any and all information in sentencing a defendant. *See* 18 U.S.C. § 3661. Further, this court has held that "[u]ncorroborated hearsay evidence contained in a presentence report may be considered by the sentencer provided the persons sentenced are given an opportunity to explain or rebut the evidence." *United States v. Evans*, 891 F.2d 686, 688 (8th Cir. 1989) (citing *United States v. York*, 830 F.2d 885, 893 (8th Cir.1987) (per curiam), *cert. denied*, 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988)), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2170, 109 L.Ed.2d 499 (1990); *but see United States v. Fortier*, 911 F.2d 100, 103–04 (8th Cir.1990) (reliance on triple hearsay contained in Presentencing Investigation Report violated confrontation clause).

> Section 6A1.3(a) of the Guidelines states in part:

> "In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

*United States v. Rivers*, 917 F.2d 369, 372 (8th Cir.1990) (footnote omitted).

brief for Caton,[7] granted defendant a continuance before the sentencing hearing, considered a supplemental presentence brief by Caton, and the testimony of Probation Officer Mason and Detective Ray of the Kentucky State Police at the hearing, which testimony it specifically determined to be "reliable," before passing sentence upon Caton. Besides the confidential informant, another defendant, Phillips, also involved in drug dealing, provided the probation officer with information about Caton. The district court determined some drug conduct not to be "relevant conduct" because there was "not a sufficient nexus." The court also considered Caton's lawyer's specific objections to the presentence report at the sentencing hearing. Caton admitted allowing Phillips to use his home "for a three to four month period" for drug dealing and that "four to five kilograms came through the premises during that period of time." Caton's lawyer stated they knew the person who they "believe might have been the confidential informant."[8] Caton admitted consuming cocaine infrequently and that his live-in companion was "consuming a good deal of cocaine." There was no basis established by Caton that would mandate the revelation of the informant's identity.

Caton objected that he was not a major player in cocaine dealing but admitted, through his lawyer: "[T]rue he was a player ... and he doesn't deny that." We find no error in the district court's handling of the voluminous sentencing information submitted to him, and accordingly affirm the district court's sentence of defendant Caton.

What has already been said establishes that Woodard also has no legitimate constitutional claim. Woodard takes issue first with the refusal of the district court to award him a two-point reduction in his offense level for acceptance of responsibility based essentially upon his plea of guilty.

He acknowledged in his brief, however, that his plea alone is not sufficient under *United States v. Guarin*, 898 F.2d 1120 (6th Cir.1990), and that the burden is upon him to prove facts to support a reduction. *See United States v. Rodriguez*, 896 F.2d 1031 (6th Cir.1990). The district court's decision on this issue is not clearly erroneous because Woodard did not satisfy acceptance of responsibility standards. *See United States v. Christoph*, 904 F.2d 1036 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991).

Next, Woodard challenged the addition of two points based on the district court's finding that he had an aggravating role under U.S.S.G. § 3B1.1. He acknowledges that his co-defendant and relative, Sims, implicated him as a participant in the drug offenses. Woodard also admitted that he was "the source of the money for the purchase of cocaine," and Sims' "partner." The problem in this regard was whether the prosecution failed to adhere to the plea agreement in which it agreed not to take a position on this issue. While we are persuaded that the court had evidence to support the two-point addition to the base offense level, we will remand for consideration by the court as to whether the government took a position at sentencing contrary to the plea agreement. *See United States v. Nelson*, 837 F.2d 1519 (11th Cir.), *cert. denied sub nom. Waldhart v. United States*, 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 58 (1988).

Woodard takes only two pages in his brief to argue the issue that it was error to deny him "the opportunity to inspect the probation officer's notes of interviews from which he gave hearsay testimony against appellant." In support of his argument, he cites *Giltner*. That case, however, as previously pointed out, supports the government's position. Woodard concedes that *Giltner* specifically permits consideration of hearsay information at sentencing.

---

7. Caton's brief referred to *United States v. Silverman*, 889 F.2d 1531 (6th Cir.1989), for establishing a preponderance of the evidence standard and dealing with a plea agreement and consideration of "relevant conduct."

8. In the "defendant's version" of the presentence report it is stated: "[H]e advised that the *informant* approached him one night to inquire if he could purchase some cocaine." Caton later sold him cocaine.

*Giltner,* 889 F.2d at 1007. He is correct in his argument that *United States v. Barrett,* 890 F.2d 855 (6th Cir.1989)[9] (the only other case he cites), holds that "[t]he extent of a defendant's constitutional right is 'not to be sentenced on the basis of invalid information,'" and that a defendant "must be given an *opportunity to rebut* any challenged information." *Id.* at 865 (emphasis added); *see also United States v. Stevens,* 851 F.2d 140, 143 (6th Cir.1988). Since Woodard was given an opportunity to explain or rebut any challenged information, he must fail in his contention that he be ordered access to the probation officer's notes of interviews with other participants and sources of information on Woodard's role in the offense. Woodard cites no authority that gives him the right he sought in his brief to obtain these interview notes, if they exist.

The district judge considered testimony from Woodard's nephew, among others, that Woodard used "people as a buffer; it was Woodard's money; it was Woodard's deal." Having heard Woodard's testimony about a major transaction for a kilo of cocaine, the district court found that he "willfully lied to the court," and that "he lied to the probation officer." Before passing sentence, the experienced district judge had before him a lengthy presentence report, a detailed response, and objections to that report, notice by the government that it would seek an increase in offense level, defendant's 14–page sentencing memorandum, testimony of the probation officer subject to cross-examination, and testimony of the defendant. The probation officer testified that Sims, Gary Caton,[10] and Ronnie Simpson (defendant in another related drug offense), among others, were sources of information on Woodard's role for the presentence report as well as Kentucky State Police records.

Woodard conceded that he was involved as a "middleman for tobacco people" in a number of cocaine transactions, but he claimed that they were "non-profit" arrangements. He persuaded Sims to surrender on the drug charges, and told him "its as much my fault as it is yours."

We find no error in the sentencing procedure as to defendant Woodard, except we remand with regard to whether the government reneged on its plea agreement, and if so, what effect this may have had on the ultimate sentence.

For the reasons stated, we AFFIRM the sentences as to defendants Silverman and Caton. We also AFFIRM in most regards as to defendant Woodard, but REMAND on the limited question of the government's alleged violation of the plea agreement.

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the judgment and in most of Judge Wellford's opinion. I write sepa-

---

**9.** Chief Judge Merritt was also on the *Barrett* panel which held that defendant's basic sentencing right was "to be sentenced on the basis of accurate information. *United States v. Rone,* 743 F.2d 1169, 1171 (7th Cir.1984); [*United States v.] Stevens,* 851 F.2d [140,] 143 [(6th Cir.1988)]." *Barrett,* 890 F.2d at 865. In *Barrett,* the defendant did have the opportunity of presenting evidence to support his position, thus the court held "he was given a full and fair opportunity to rebut the government's evidence on that issue." *Id.* (There was no evidence of the declarant, against whom threats by the defendant were allegedly made, testifying subject to cross-examination at the sentencing hearing.) *Stevens,* cited in *Barrett,* contained the following language:

> Due process does not require an evidentiary hearing on all challenged information in the pre-sentence report. "Although a defendant who contests the accuracy of PSI material on which the court relies in imposing sentence must be given a chance *to explain* or *rebut* this information, the procedure for rebuttal lies within the sound discretion of the sentencing judge...."

*Stevens,* 851 F.2d at 144, 145 n. 8 (citation omitted; emphasis added).

**10.** The right to cross-examination of co-defendants and co-conspirators at trial is doubtful, and even more doubtful is the existence of such a right at sentencing. There is little reason to suspect that either Caton or Sims would have testified favorably for Woodard, and thus have increased their own liability and sentence. Any claimed confrontation right so as to cross-examine them as sources at Woodard's sentencing was of no real substance. Woodard had the right, in any event, if he wished, to subpoena either Sims or Caton to rebut or explain the government's proof and information against him.

rately, however, to record my individual thoughts on use of the "minimal indicia of reliability" test for determining the admissibility of hearsay—a test I would reject in favor of the "probable accuracy" test prescribed in U.S.S.G. § 6A1.3(a)—and on the argument advanced by defendant Caton as to the appropriate standard of proof in guideline sentencing. (Neither of the other defendants has raised the latter issue before the en banc panel.)

To make what follows intelligible, I need to explain that if one assumes Mr. Caton belonged in the criminal history category where the probation officer recommended he be placed under the guidelines (Category I), and if Mr. Caton's offense level was as calculated by the district judge (Offense Level 14), the sentence range prescribed in the U.S. Sentencing Commission's *Guidelines Manual* was a term of imprisonment of not less than 15 months and not more than 21 months.[1] Judge Forester ultimately exercised the departure authority conferred by 18 U.S.C. § 3553(b) and sentenced Mr. Caton to imprisonment for 46 months. (This sentence—two months short of four years—was less than one-fifth the 20–year maximum sentence authorized by Congress in 21 U.S.C. § 841(b)(1)(C).)

Now to defendant Caton's argument. Relying on Judge Becker's opinion in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir.1990), Mr. Caton argues not only that hearsay evidence ought not to have been admitted at his sentencing hearing, but also that the factual findings on which his upward departure was based ought to have been made under "a reasonable doubt standard of proof (or at least a clear and convincing standard).…" *Kikumura*, as I read it, does not support Caton's argument.

The defendant in *Kikumura*—an international terrorist who was said by a confidential informant to have trained other terrorists at a camp in the Bekaa Valley of Lebanon before coming to the United States to maim or kill Americans by exploding anti-personnel bombs at a Navy recruiting office in New York City—was sentenced to imprisonment for 30 years.[2] The defendant's guideline range was only 27–33 months, so the trial court's upward departure resulted in a sentence more than 10 times as long as the maximum within-range sentence. With a departure of that magnitude—said to be the largest departure in the history of federal guideline sentencing, see 918 F.2d at 1089—the Third Circuit concluded that the sentencing proceeding could fairly be characterized as "a tail which wags the dog of the substantive offense." *Kikumura*, 918 F.2d at 1100–01, quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986). And under these truly unusual circumstances, the Third Circuit held, the hearsay statement of a confidential informant could be considered at sentencing only if found to be "reasonably trustworthy" (a standard I should have thought comparable to the one already prescribed by the Sentencing Commission, see U.S.S.G. § 6A1.3(a)), while the departure itself could only be based on facts established by evidence that was at least "clear and convincing." *Kikumura*, 918 F.2d at 1100–03. The lower levels of procedural protection historically applicable in sentencing proceedings (*i.e.*, "some minimal indicium of reliability" for hearsay and a "preponderance of the evidence" standard for factfinding) had to be "ratcheted up," the

---

1. As stated in the detailed exposition of defendant Caton's case at pages 1506–07 of the opinion written by Chief Judge Merritt for the original panel majority, the probation officer recommended "relevant conduct" findings that would have produced a much higher guideline range: imprisonment for 151–188 months. The district judge, in a five-page opinion filed after he had conducted an evidentiary hearing on the matter, explicitly rejected this recommendation. The district judge (Forester, J.) also gave notice that "the Court is considering an upward departure from the [15–21 month] guideline range."

2. The factual details of this remarkable case are set forth at length in the trial court's sentencing opinion, *United States v. Kikumura*, 706 F.Supp. 331 (D.N.J.1989). There was no room for doubt that the defendant was guilty of the charges against him; through his lawyer, William Kuntsler, he waived trial by jury and stipulated to "all of the moving facts that led to the indictment.…" *Id.* at 333.

Third Circuit said, because of the extraordinary magnitude of the departure from the guideline range. *Id.* at 1101.

The *Kikumura* court went out of its way to stress that the preponderance standard and the minimal indicia of reliability test are "clearly appropriate" and "perfectly adequate" in most sentencing cases. *Id.* at 1100, 1101.[3] "At a garden variety sentencing hearing," where the sentencing court does not depart upwards "dramatically," the Third Circuit stated without qualification that *"a preponderance standard appl[ies]...."* *Id.* at 1103. (Emphasis supplied.)

Mr. Caton's case is definitely of the garden variety. The sentencing court's upward departure of 25 months comes nowhere close to the departure of 327 months—more than 10 times the guideline maximum—imposed in *Kikumura.* There may well be other unusual situations where it would be appropriate to use the "clear and convincing evidence" standard held applicable in *Kikumura*—other circuits have recognized that possibility[4]—but the instant case, in my judgment, does not present such a situation. This case is more like *United States v. Mobley,* 956 F.2d 450, 458–459 (3d Cir.1992), where the Third Circuit rejected a due process argument in the context of a six-month enhancement of a sentence that would otherwise have been 21 months.

One final point needs to be made: Mr. Caton cannot honestly blame his 46–month sentence on the Sentencing Commission.

**3.** *Kikumura* thus cannot be squared with the argument, advanced by Judge Merritt in the case at bar, that *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), and *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), require application of the Confrontation Clause to the federal guideline sentencing system. Every court of appeals to have addressed such a proposition has rejected it. See Becker and Orenstein, "The Federal Rules of Evidence After Sixteen Years," 60 Geo. Wash.L.Rev. 857, 888–89 (1992), listing cases at n. 160.

I would add, in this connection, that in *Specht* Justice Douglas specifically endorsed *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), where the Supreme Court, speaking through Justice Black, concluded that on the facts presented the Constitution did not bar a sentencing judge from considering hearsay information even though the judge used the information in deciding to impose a sentence of death.

As to then-Justice Rehnquist's opinion in *McMillan,* it specifically endorsed and applied *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), where the Supreme Court rejected a contention that facts affecting the severity of punishment must be proved "beyond a reasonable doubt." *McMillan,* 477 U.S. at 83–85, 106 S.Ct. at 2414–16. The *McMillan* court also rejected an argument that due process required use of a "clear and convincing evidence" standard; at least in the case before it (which, as *Kikumura* notes, was not one in which a sentencing tail was wagging a substantive offense dog), the *McMillan* court had little difficulty in concluding that "the preponderance standard satisfies due process." *Id.,* 477 U.S. at 91, 106 S.Ct. at 2419. Notwithstanding that the sentencing scheme at issue in *McMillan* took away the trial court's discretion to impose a sentence of less than 60 months if the court found by a preponderance of the evidence that the defendant visibly possessed a firearm during the commission of the offense, the *McMillan* Court could "see nothing in [this] scheme that would warrant constitutionalizing burdens of proof at sentencing." *Id.* at 92, 106 S.Ct. at 2419.

Judge Becker and Prof. Orenstein have suggested that the Supreme Court, acting through the appropriate advisory committee, ought to amend the Federal Rules of Evidence—a process subject to congressional approval under 28 U.S.C. § 2074—to reflect the changed role of sentencing hearings by giving convicted persons "more protections." Becker and Orenstein, *op. cit.,* at 890. There may be situations where additional protections would prevent injustice, but I doubt that such a situation is presented in Mr. Caton's case. The guidelines have already given Mr. Caton more protection against the use of hearsay than he would have had before their adoption, because they require more than "some minimal indicia of reliability"—they require sufficient indicia of reliability to support the "probable accuracy" of the hearsay. U.S.S.G. § 6A1.3(a). I can see no justification for conflating "probable accuracy" and "minimal indicia of reliability," see Note, "Confrontation and Sentencing," 105 Harv.L.Rev. 1880, 1884 (1992)—and our en banc court endorses the probable accuracy test in the majority opinion—but I am satisfied that the hearsay used against Mr. Caton met the appropriate test. So too, in my view, did the evidence used against defendants Silverman and Woodard.

**4.** See *United States v. Lam Kwong–Wah,* 966 F.2d 682 (D.C.Cir.1992); *United States v. Schuster,* 948 F.2d 313, 315 (7th Cir.1991); *United States v. Townley,* 929 F.2d 365, 370 (8th Cir. 1991); *United States v. St. Julian,* 922 F.2d 563, 569 n. 1 (10th Cir.1990).

His is not a case where a discretionless trial judge, mindlessly applying a Rube Goldberg formula dreamed up by a committee of social scientists in Washington, was constrained to impose a sentence that any reasonable person would find aberrational. For better or worse, Mr. Caton was sentenced the old-fashioned way—by a conscientious and objective trial judge giving careful consideration to the entire picture, at least insofar as the elements of that picture were supported by what he considered to be sufficient indicia of reliability, and then exercising his best judgment as to the sentence that would be most appropriate for the particular individual standing before him.[5]

Sentencing, as our colleague Judge Jones recently said in a very eloquent opinion,[6] "is and must remain an intensely human process." No sensible person wants human beings to be sentenced solely by formula; if the sentencing guideline system is to work in the way that Congress intended, it is essential that judges who send criminals to prison retain a significant measure of discretion to do what seems fair and just in each particular case. The judge who accepted defendant Caton's plea of guilty and set the sentence at 46 months recognized that he had such discretion, and he used it. Acting on the type of information that sentencing judges have been taking into account for hundreds of years, Judge Forester imposed the sentence he thought Mr. Caton deserved—and he did so despite the Sentencing Commission, not because of it.

Mr. Caton's unhappiness with the result in this case reflects a desire that the discretion historically vested in sentencing judges be curtailed more severely than the guidelines curtail it now. I understand this desire, but I do not fully share it.

MERRITT, Chief Judge, dissenting.

The Sentencing Commission and its chairman refer to the "relevant conduct" provisions as "The Cornerstone of the Federal Sentencing Guidelines."[1] In these three cases we see the "relevant conduct" system run amok. Unreliable double, triple and quadruple hearsay information provided by the prosecution about other *unconvicted* crimes is used to increase substantially the defendants' sentences over the original level of punishment provided in the Sentencing Guidelines for the crimes for which the defendants have been *convicted.* The new unconvicted hearsay crimes are made up by the prosecution and the probation office without notice after the guilty plea, and the district judge must

---

**5.** Judge Merritt, in his dissent, suggests that to a degree not likely to have occurred before the Sentencing Commission arrived on the scene, the sentence imposed in this case was somehow controlled by the prosecutor rather than by an unbiased, objective, neutral federal judge. The careful and detailed statement of the facts at pages 1506–07 of the opinion Judge Merritt wrote for the original panel majority does not support this suggestion.

**6.** *United States v. Davern,* 970 F.2d 1490, 1516 (6th Cir.1992) (Jones, J., dissenting).

**1.** William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines,* 41 S.C.L.Rev. 495, 496 (1990).

Section 1B1.3 defines "relevant conduct" as follows:

§ 1B1.3. *Relevant Conduct (Factors that Determine the Guideline Range)*

(a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(1) above, and all harm that was the object of such acts or omissions; and

(4) any other information specified in the applicable guideline.

multiply the punishment on the basis of these new unconvicted crimes.

In *Silverman,* the district court believed itself compelled under the "relevant conduct" system to increase the defendant's sentence by five years over the convicted offense level. This was done on the basis of multiple hearsay from unnamed sources, furnished by the prosecution and a DEA agent, concerning additional unconvicted crimes. The *Caton* and *Woodard* cases are similar. The prosecution asked for and received from the probation officer large "relevant conduct" increases in the sentence on the basis of multiple hearsay from criminal confederates, usually unnamed, who have furnished information to the prosecution about other unconvicted crimes. In *Silverman,* for example, an unnamed informant tells a police officer, who tells the police chief, who tells a DEA agent, who tells a probation officer, who tells the court, that Silverman was a major dealer in drugs the year before the quarter-ounce transaction for which he is convicted. The amount of drugs in prior unconvicted transactions is then estimated by the probation officer and Silverman's sentence is automatically increased more than five

years based on the quintuple hearsay of witnesses who no one suggests were unavailable. Our Court justifies this kind of sentence by simply holding the Confrontation Clause inapplicable.[2]

This Court's holding—*i.e.* constitutionally reliable evidence of the unconvicted crime is unnecessary—is bad enough. What makes the decision even worse is that the Court need not have reached the constitutional issue at all had it simply interpreted the Guidelines in accordance with Congress' intent. Instead, this Court treats the "relevant conduct" provisions as sentencing "imperatives" to be followed rigidly like statutes. *See United States v. Davern,* 970 F.2d 1490 (6th Cir.1992) (*en banc*). In so construing the relevant conduct provisions, our Court violates, in my opinion, both the unambiguous language of key sections of the Sentencing Reform Act of 1984, 28 U.S.C. § 994(1), and 18 U.S.C. § 3553(a), as well as the Due Process, Notice and Confrontation Clauses of the Constitution. The Court's unwillingness to confine the Sentencing Commission and its Guidelines within applicable statutory and constitutional limitations is unfortunate be-

---

**2.** A belated addition to the opinion of the court at page 1514 of the majority opinion seems to deny that the District Court relied on multiple hearsay in enhancing Silverman's sentence. If this is what the majority means to say, the Court is in error. The record clearly proves that the additional sentence based on unconvicted conduct is founded entirely on hearsay, most of it three or more levels deep. Judge Graham below specifically ruled that multiple hearsay is admissible. He states at page 301 of the Appendix that "the facts clearly indicate that this [the two ounce transaction] is only the top of the iceberg" and that "the information before the court could lead to the conclusion that he [Silverman] previously engaged in the sale of not only one kilo of cocaine, but perhaps one and a half or two kilos of cocaine." And for this reason Judge Graham increased the sentence. I can find no nonhearsay evidence in the record from which such a finding and sentence could be made. Here is an example of the testimony of DEA agent Robbins that prompted this finding:

'Q. Now, did you become aware that Mr. Silverman had also been under investigation by the Ohio Bureau of Criminal Investigation?
A. I was aware they were conducting an investigation, that's correct. I do not know specifically what their investigation included.

Q. Did you become aware that he had been under investigation by the Athens of Ohio Police Department?
A. Yes, I had a conversation with the chief of police at Athens, Georgia—Athens Ohio.
Q. What did you learn from the chief?
A. Ira Silverman had been under investigation for some time by his department and the Ohio University Department as a dealer of cocaine, marijuana and also at one time acid, LSD.
Q. Were you able to ascertain if the Athens, Ohio police department had any evidence of his involvement in any of those activities?
A. I don't know that we discussed real or hard evidence. It was more that they had been investigating him, and they were aware that he was selling drugs on campus.

Transcript, Presentencing Hearing, *United States v. Silverman,* No. CR–2–88–025 (S.D.Ohio, Aug. 19, 1988), *contained in* Joint Appendix, No. 90–3205, at 250–51. Moreover Judge Graham at page 289 of the Appendix explicitly accepted the presentence report of officer Dierna as a key basis for sentencing. That report is appended as an appendix to this opinion. The facts stated there which the court accepted over defendant's objection are *all* hearsay—most of them 3, 4 and 5 levels deep.

cause of the grave injustices it allows and because it severely undermines the role of the federal court in protecting the rights of the accused.

I will discuss the statutory issues first, and then proceed to the constitutional questions raised by this trilogy of cases.

## I. Relevant Conduct System Violates 28 U.S.C. § 994(l)

We have seen how our Court has chosen to treat the numerous relevant conduct upward adjustment possibilities contained throughout the Guidelines as "imperatives" or mandates for the sentencing court to apply automatically without deviation, based largely on the information concerning uncharged and unconvicted conduct provided by the prosecutor. No distinction in sentencing may be drawn, according to the Court, between convicted conduct and unconvicted conduct and between completed crimes and unsuccessful attempts.

The first point I want to make is that this position clearly contravenes the Guidelines' enabling legislation. The Sentencing Reform Act of 1984, the Act which authorized the Guidelines, does not expressly mention or authorize such a "relevant conduct" sentencing system.[3] In 28 U.S.C. § 994(l) (1988), Congress does provide for a system that will deal with multiple offenses: § 994(l) allows "incremental penalties" for multiple offenses, but limits such penalties to the situation in which a defendant is *convicted of multiple offenses committed in the same course of conduct.* To this extent Congress provided for a conviction offense sentencing system just as the states have created in similar situations.[4] The statute does not authorize incremental penalties when a defendant is convicted only of a single offense during a time period in which he may also have committed other offenses if he is not charged and convicted for those offenses.

Section 994(l) is plain and unambiguous. It authorizes the Sentencing Commission only to impose:

> an incremental penalty for each offense in a case in which the defendant is *convicted* of—
>
> (A) multiple offenses committed in the same course of conduct that result in the exercise of ancillary jurisdiction over one or more of the offenses; and
>
> (B) multiple offenses committed at different times.

28 U.S.C. § 994(l) (1988) (emphasis added). No language of the Sentencing Reform Act of 1984 allows what the Sentencing Commission and now our Court have done: imposing incremental penalties for *unconvicted* offenses either "in the same course of conduct" or "at different times." The Act repeatedly refers to a "defendant who has been found guilty of an offense." *See, e.g.,* 18 U.S.C. §§ 3552(a), (b) & (c), 3552(b), 3554, 3555, 3556, 3561, 3571, 3581. It does not refer to unconvicted relevant conduct.

The Guidelines should not be read to treat convicted and unconvicted conduct alike because such a reading exceeds the authority granted in the enabling legislation to either the Sentencing Commission or a court. It contravenes the plain language of the enabling legislation. *See United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) (starting point for statutory interpretation is the language of the statute itself). *See also Ardestani v. INS,* — U.S. —, —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) (a "strong presumption" exists that the plain language, using the ordinary meaning of the words, clearly expresses congressional intent). Evidently, the Sentencing Commission does not feel restrained by the express language of § 994(l). It has seized its authority to impose incremental penalties in circumstances involving multiple of-

---

**3.** Every state sentencing commission in the United States, contrary to the federal commission, has adopted *conviction offense sentencing* instead of so-called "real offense sentencing" or sentencing on the basis of "relevant conduct." They did so because they believed that such a "relevant conduct" system not based on convict-

ed conduct would violate due process and other constitutional provisions. Dale G. Parent, *Structuring Criminal Sentences: The Evolution of Minnesota's Sentencing Guidelines* 62–63, 159–61 (1988).

**4.** *See supra* note 2.

fenses without heeding the language restricting the imposition of such penalties to conduct related to the offense of conviction only.[5]

The Commission takes the superficially appealing position that it is proper to impose incremental penalties for unconvicted conduct because it claims that courts have always done so. Supporters point out that sentencing courts traditionally had unbridled discretion with respect to what information about the defendant would be considered when imposing a sentence. That reasoning is flawed, however, because it does not acknowledge the prosecutor's control of the outcome in the relevant conduct system or the fundamental distinction between allowing an unbiased court to consider unlimited factors and compelling the court to impose a sentence that reflects information selectively disclosed by the prosecutor. Vesting control over sentencing in an unbiased, objective, neutral federal judge is completely different from vesting such discretion in the prosecutor, a party to the case. The difference should be obvious, but apparently it is not obvious to the Sentencing Commission.

I can find no legislative history contrary to the language of § 994(l) and supporting the proposition that Congress intended to mandate punishment for unindicted or unconvicted offenses as well as convicted offenses. In the absence of clear evidence that Congress intended to augment the penalty a defendant receives for a charged and convicted offense by additional penalties for uncharged conduct, the venerable rule of statutory construction, *expressio unius est exclusio alterius*—i.e., "the expression of one [thing] is the exclusion of the other"—counsels against so broad an interpretation. *See generally National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); *Neuberger v. Commissioner*, 311 U.S. 83, 88, 61 S.Ct. 97, 101, 85 L.Ed. 58 (1940); *Ford v. United States,* 273 U.S. 593, 611–12, 47 S.Ct. 531, 537, 71 L.Ed. 793 (1927). Congress's limitation of the Sentencing Commission's rule-making authority to convicted offenses is explicit. The expression of this Congressional limitation restricts "incremental" sentencing for offenses to "convicted" offenses. *Cf.* Norman Singer, 2A *Sutherland Statutory Construction* § 47.23 (5th ed. 1991). The majority's expansion of the types of conduct permissible for Guidelines sentencing violates this "ancient maxim" of statutory construction, *Railroad Passenger Corp.,* 414 U.S. at 458, 94 S.Ct. at 693, and neglects the plain meaning to be assigned to Congress's words so directly expressed in § 994(l): only "convicted" multiple offenses will enter into incremental punishment deliberations.

In another, almost identical sentencing context, the Supreme Court has held that Congress expressly limited the sentencing calculus only to that conduct arising from the offense of conviction. It held that restitution to the victim may only be required under 18 U.S.C. § 3580(a) for the crime of conviction, not for unconvicted relevant conduct. The Supreme Court said that if Congress had intended to allow consideration of unconvicted "relevant conduct" attributable to a defendant, "Congress would likely have chosen language other than 'the offense,' *which refers without question to the offense of conviction.* " *Hughey v. United States,* 495 U.S. 411, 418, 110 S.Ct. 1979, 1984, 109 L.Ed.2d 408 (1990) (emphasis added). Thus the Court concluded, without dissent, that for losses arising from a crime, the offense of conviction establishes the "outer limits" of a restitution order. The congressional intent behind § 994(l) to limit incremental penalties to convicted conduct is plainly mirrored in the Supreme Court's reasoning in *Hughey.* The same interpretation should be given to the same "convicted offense" language of both the restitution and incremental punishment provisions of the enabling act.

---

5. It is proper to enhance a defendant's sentence for conduct related to the offense of conviction such as role in the offense, degree of planning required, and the defendant's criminal history.

The Guidelines already do this, but they go further by also mandating incremental penalties for separate offenses that the prosecution has not and may not be able to prove.

It is bad judicial form simply to refuse to follow the policy expressly stated by Congress, in favor of a contrary policy perpetuated by an administrative agency, especially when that congressional policy is designed to maintain a degree of judicial control over the sentencing process. I do not understand why my sisters and brothers, usually the voices of sweet reason and deference to the majoritarian branch of government, persist in following the Sentencing Commission and the Department of Justice in their defiance of the policy stated expressly in the statute we are interpreting. I understand as a matter of public choice theory of incentives why the Sentencing Commission and the Department of Justice might believe it is in their interest to control the sentencing process. *See* James M. Buchanan & Gordon Tullock, *The Calculus of Consent: Logical Foundation of Constitutional Democracy* (1965). It is certainly in their bureaucratic interest to do so. Congressional appropriations and governmental power depend upon it. But it is not in anyone else's interest to adopt a policy contrary to the one expressed by Congress. It is certainly not in the interest of the judiciary as the "least dangerous

branch," and not in the interest of individuals in society who may be wrongly accused by prosecutors whose power has now been so enlarged through our default. The prosecutors now effectively control both the charging system and the sentencing system. And to an ever-increasing extent, the two are one and the same.

What treatment of the "incremental penalty" language of § 994(1) does the Sentencing Commission give in the Guidelines Commentary? It simply never mentions it anywhere. It does so in favor of a rigid system of unconvicted "relevant conduct," which allows greatly enhanced sentences based on constitutionally unreliable evidence.

## II. Relevant Conduct System Violates 18 U.S.C. § 3553(a) [6]

The second point is that this rigid "relevant conduct" system also ignores § 3553(a) of the enabling act. This section provides in mandatory language in the first sentence that the District Court should consider the facts and fix a sentence "not greater than necessary to comply" with a group of "purposes" or factors: (a) a "just

**6.** The text of § 3553(a) provides in part as follows:

(a) Factors to be considered in imposing a sentence.—

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the *purposes* set forth in paragraph (2) of the subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; ...

Referring to § 3553(a) the Senate Report explains:

The bill requires the judge, before imposing sentence, to consider the history and characteristics of the offender, the nature and circumstances of the offense, *and the purposes of sentencing.*

S.Rep. No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3235 (emphasis added).

The section-by-section analysis of the 1987 Amendments to the Sentencing Reform Act of 1984 by the House of Representatives reinforces the view that the correct sequence of sentencing steps must first take into account § 3553(a):

Section 3553(a) as enacted by the Sentencing Reform Act of 1984 requires that the court (1) consider several factors, including the purposes of sentencing, and (2) "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing. Thus, if the court finds that the sentence called for by the applicable sentencing guidelines is greater than necessary to comply with the purposes of sentencing, section 3553(a) would seem to require the court to impose a more lenient sentence.

Such an interpretation, it might be argued, is inconsistent with the Sentencing Reform Act's intention to limit judicial discretion in sentencing. That argument, however, is not convincing. The Sentencing Reform Act of 1984 limited, but did not eliminate, judicial sentencing discretion.

133 Cong.Rec. 31,947 (1987).

punishment" which will "reflect the seriousness of the offense," (b) the need for "deterrence of criminal conduct," (c) the need to protect the public from "further crimes of the defendant," (d) the need to rehabilitate the defendant through "educational ... and other correctional treatment," and (e) the availability of various alternative forms of sentences. This duty to consider the facts according to these steps and to impose a "just punishment" which is "not greater than necessary" is the first duty required of the sentencing court by the statute.

The enabling act's most prominently featured element of sentencing in individual cases is the "purposes of sentencing" provision in this section. After enumerating these purposes in 18 U.S.C. § 3553(a), Congress referred to the purposes 17 times in the course of its instructions to the Commission and the courts.[7] Kenneth Feinberg, who as Chief Counsel of the Senate Judiciary Committee was a primary author of the legislation creating the Commission, recently said:

> A strong argument can be made that, by ignoring the Congressional mandate to consider purposes, the Commission has failed to consider variables very relevant to the individually tailored sentence. In the absence of more explicit language from the Commission detailing the consideration given criminal justice purposes, courts would appear to be free to cite the abdication of Commission responsibility in this area.[8]

The Sentencing Commission and our Court simply ignore the language of this "purposes" section in approving a rigid "relevant conduct" system which results in large increases in sentences automatically administered for unconvicted conduct.

### III. Relevant Conduct System Violates Confrontation Clause

I agree with my colleague, Chief Judge Richard Arnold of the Eighth Circuit, in his recent dissenting opinion in *United States v. Wise*, 976 F.2d 393 (8th Cir.1992), in which he argues that the Confrontation Clause must now be applied to the sentencing process. By ignoring § 994(e) and § 3553(a) the Sentencing Commission, and now our Court, have created a "relevant conduct" sentencing system of "mechanical" rules to be applied without deviation on the basis of constitutionally unreliable evidence. By developing a sentencing code of "mechanical" rules, the Sentencing Commission under the Sentencing Reform Act of 1984 "revolutionized the manner in which the district courts sentence persons convicted of federal crimes." *Burns v. United States*, — U.S. —, —, 111 S.Ct. 2182, 2184, 115 L.Ed.2d 123 (1991). The old informal system of indeterminate sentencing was not adversary in nature. Independently of the lawyers in the case and the adversary system, the judge—using probation officers who communicated with him in private and *ex parte*—did his own investigation of the offender's character, family circumstances and criminal history, as well as the harm to the victim. There were no rules allocating burdens of proof between the parties concerning the existence of sentencing facts, nor were there rules concerning disclosure of the judge's sources of information. Most important of all, the old system did not require the judge to find facts or to base his sentence on the existence or nonexistence of a particular fact or group of facts. The old nonadversary process did not require factfinding because district judges had an absolute and unreviewable discretion, so long as the sentence imposed did not exceed the statutory maximum for the offense. Sentencing was an intuitive process.

All that has changed.[9] Under Guidelines Ch. 5, Pt. H, age, education, employment

---

**7.** *See* Daniel J. Freed & Mark Miller, *Taking "Purposes" Seriously: The Neglected Requirement of Guideline Sentencing*, 3 Fed.Sentencing Rep. 295, 297 (1991).

**8.** Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing*, 3 Fed.Sentencing Rep. 326, 328 (1991).

**9.** The Sentencing Commission in its commentary to § 6A1.3 states:

and family and community circumstances may no longer be considered. These facts which usually help the defendant are irrelevant. Mainly it is now just the facts concerning the criminal activity—facts furnished by the prosecution in hearsay form—that are now relevant. The punishment must suit the crime, not the individual defendant. Only uniformity of sentences is important. Rehabilitation is out. Long sentences based on retribution are in.

Although the use of probation officers continues, the new system completely changes the discretionary, nonadversary, nonfactual nature of the sentencing process by introducing the adversary sentencing hearing, the need for precise and accurate findings of disputed facts about other criminal conduct and absolute rules to be applied without deviation requiring the district court to increase dramatically the sentence based on the unconvicted conduct. Both § 6A1.3 of the guidelines, entitled "Resolution of Disputed Factors (Policy Statement)" and Federal Rule of Criminal Procedure 32(c)(3)(D) require specific findings of fact.[10]

As these cases demonstrate, the existence or nonexistence of a particular fact— for example, the amount of money involved or drugs possessed or, as in the three cases under review here, the existence of additional wrongful conduct—may automatically double or even in some cases multiply tenfold the particular sentence that judges are required to impose under the Guidelines code. The entire purpose of the sentencing code is to eliminate disparity in sentencing by isolating and elevating the importance of particular facts in the sentencing process. A sentencing court must find facts at each stage of the nine sentencing steps prescribed by the Sentencing Commission in § 1B1.1. For each crime, both convicted and unconvicted, the code selects certain operative facts concerning criminal activity as important and excludes other ameliorative facts as irrelevant. The operative facts selected automatically produce an "offense level" with a narrow sentencing range for the judge to follow. The sentence imposed is reviewable on appeal as a matter of right.[11]

The dramatic change in the importance of factfinding concerning unconvicted crimes in the sentencing process, and the elimination of rehabilitation and intuitive factors from consideration, should now require at least that the reliability of the factfinding process be tested under the Confrontation Clause.[12] Heretofore the Confrontation Clause has not been thought to apply to the sentencing phase of the criminal trial because of the informal, nonadversary nature of the process and the absolute, unreviewable discretion of the district judge, a discretion unrelated to the finding of particular facts.

The case of *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), is no longer applicable. In *Williams*, a state judge sentenced the defendant to death for murder, and the question was whether the Due Process Clause—

---

The informality [of the old system] was to some extent explained by the fact that particular offense and offender characteristics rarely had a highly specific or required sentencing consequence. This situation will no longer exist under sentencing guidelines. The court's resolution of disputed sentencing factors will usually have a measurable effect on the applicable punishment.... [D]isputes about sentencing factors must be resolved with care.

**10.** Section 6A1.3(b) provides: "The court shall resolve disputed sentencing factors in accordance with Rule 32(a)(1), Fed.R.Crim.P. (effective Nov. 1, 1987), notify the parties of its tentative findings and provide a reasonable opportunity for the submission of oral and written objections before the imposition of sentence." Rule 32(c)(3)(D) provides that "the court shall, as to each matter controverted, make a finding as to the allegation...." Further the rule provides that "a written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report...."

**11.** 18 U.S.C. § 3742 provides for appellate review of Guidelines sentences.

**12.** Section 6A1.3 of the Guidelines provides only that the court will consider the relevant evidence "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

not the Confrontation Clause [13]—allowed the trial judge to use general hearsay information in the sentencing process. The *Williams* opinion makes clear that the decision is intended to allow the "modern" theories of "indeterminate," "individualized," "discretionary" intuitive sentencing designed to "rehabilitate" the offender to be put into practice without constitutional limitations that could undermine the experiment. The Court contrasted the new, more "humane" system of rehabilitation with the previous harsh system of determinant sentencing based on retribution and deterrence. The "new" experimental system reviewed in *Williams* in 1949 is now the "old" system—characterized, it is said, by unconscionable "disparity." It is the very system rejected by the Sentencing Commission in the Guidelines. The system reviewed in *Williams* was a nonadversary, indeterminate, individualized system vesting complete discretion in the judge without the need to find facts and without the requirement that sentences be multiplied on the basis of unconvicted conduct. The system put into place by the new sentencing code is different in all these respects from the former system it replaced.

We should not be misled into believing that the *Williams* opinion applies to all sentencing systems, for *Williams* is not the only law on the subject from the Supreme Court. The Court has recognized that when the sentencing system changes, the nature of the applicable constitutional limitations may also change. In *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), the Court required the application of the Confrontation Clause to the sentencing system at hand. There the Colorado sentencing system allowed the sentence to be increased to life from a maximum of 10 years upon a finding by the sentencing judge that the offender, based on past conduct, "if left at large, constitutes a threat of bodily harm to members of the public, or is an habitual offender and mentally ill." *Id.* at 607, 87 S.Ct. at 1211.

The Court said the Colorado system of enhanced sentencing contemplated an adversary proceeding and "a new finding of fact that was not an ingredient of the offense charged." *Id.* at 608, 87 S.Ct. at 1211–12. Under such circumstances the alleged offender must "have an opportunity to be heard, be confronted with the witness against him, have the right to cross-examine, and to offer evidence of his own." *Id.* at 610, 87 S.Ct. at 1212.

The *Specht* case expressly distinguishes the sentencing system reviewed in *Williams* on the ground that the Colorado scheme requires factfinding in an adversary setting rather than the exercise of pure unreviewable discretion without the necessity of finding facts. The Supreme Court has continued to cite and respect the distinction based on factfinding drawn in *Specht. See McMillan v. Pennsylvania*, 477 U.S. 79, 88–91, 106 S.Ct. 2411, 2417–19, 91 L.Ed.2d 67 (1986).

It is especially important that the cross-examination requirements of the Confrontation Clause be observed when the evidence in question, as in the present cases, consists primarily of double and triple hearsay from alleged accomplices, confederates and co-conspirators. This requirement becomes even more important when, as in these cases, the sentence is based in part on multiple hearsay offered by the prosecution from unnamed confederates.

A long line of Supreme Court cases interpreting the Confrontation Clause has created a strong presumption against the trustworthiness of co-conspirators' statements that are made after a conspiracy has terminated in arrest. In the most recent case on point, *Lee v. Illinois*, the Court held inadmissible a co-conspirator's confession. It said that the "truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." 476 U.S. 530, 541, 106 S.Ct.

---

**13.** In 1949, when *Williams* was decided, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), had not yet incorporated the Confrontation Clause into the Fourteenth Amendment as a right in state prosecutions. The older concept of "ordered liberty" under *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), was still the guiding principle then.

2056, 2062, 90 L.Ed.2d 514 (1986). Due to a co-conspirator's "strong motivation to implicate the defendant and to exonerate himself," a co-conspirator's statements about the defendant's involvement in the crime should be viewed with "special suspicion." *Id.* (quoting from *Bruton v. United States,* 391 U.S. 123, 141, 88 S.Ct. 1620, 1631, 20 L.Ed.2d 476 (1968) (White, J., dissenting)) (citations omitted). This suspicion stems from the "reality of the criminal process, namely, that once partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." 476 U.S. at 544–45, 106 S.Ct. at 2064.

In the three cases before the court, confederates provided hearsay evidence of other crimes. In most "relevant conduct" cases across the country, double, triple and even quintuple accomplice hearsay furnished informally to the probation officer by the prosecution after a guilty plea is used to multiply the sentence. It is often the only evidence used to increase the sentence. That system of "relevant conduct" based on hearsay is now standard operating procedure in the federal courts across the country.[14] *Silverman* is a good example. Unnamed informants tell a police officer, who tells the police chief, who tells a DEA agent, who tells a probation officer, who tells the court, that Silverman was a major dealer in drugs the year before the quarter-ounce transaction for which he is convicted. The amount of drugs in prior unconvicted transactions is then estimated by the probation officer and Silverman's sentence is automatically increased more than five years based on the quintuple hearsay of witnesses who no one suggests were unavailable. Our court justifies this result without confronting the arguments to the contrary or recognizing the implications of what it is doing. The court avoids confrontation on two fronts—its duty to *confront* the reasoning process that leads to the conclusion that the new sentencing grid has so changed the rules that the defendant must now be allowed the protection of the right of *confrontation.*

### IV. Relevant Conduct System Violates Due Process

The "relevant conduct" provisions of the new sentencing code are so fundamentally inequitable and contrary to principles of evenhanded justice that they violate due process of law. The relevant conduct provisions are now so weighted in favor of the prosecution that defendants must have their sentences increased for charged conduct for which the jury has returned a verdict of "not guilty" if the district judge believes the conduct occurred. The relevant conduct system now makes acquittal by the jury on some counts irrelevant to the sentence imposed for the convicted offense. *United States v. Martin,* 972 F.2d 349 (6th Cir.1992) (holding that a jury verdict of acquittal is irrelevant because sentence must be increased for "relevant conduct" if court believes conduct occurred). *Accord, United States v. Moreno,* 933 F.2d 362, 374 (6th Cir.1991).

The due process violation occurs in the instant case because, at the time the plea must be entered, the defendant receives no notice of the additional crimes for which the court will enhance the defendant's sentence. Only after the plea is already entered will a probation officer compile the convicted and unconvicted crimes for which sentence will be imposed depending on the uncharged, "relevant conduct" information that the prosecutor chooses to disclose to the court through the probation office. Such a system of sentencing places almost exclusive control over the sentence in the prosecutor because the judge now is compelled to base the sentence on uncharged conduct largely provided by the prosecutor. This system effectively removes the judge

14. For a further, more comprehensive description of the system in operation, see Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers,* 101 Yale L.J. 1681 (1992). Professor Freed is one of the country's leading scholars in the field of sentencing. He is the editor of the *Federal Sentencing Reporter* and the Director of the Criminal Sentencing Program at Yale Law School from which the main ideas for the Sentencing Reform Act of 1984 emanated.

from any meaningful role in the sentencing process and substitutes the prosecutor for the judge. Such a system—which substitutes the prosecutor for the judge after a plea of guilty is entered, and which gives no explicit notice of the crimes for which the defendant will be sentenced before the plea—violates due process. *See United States v. Kikumura,* 918 F.2d 1084, 1119 (3rd Cir.1990) (Rosenn, J., concurring) (reasoning that a defendant's due process rights may be violated by sentencing system that "replaced judicial discretion over sentencing with prosecutorial discretion"); *United States v. Gutierrez,* 908 F.2d 349, 354–55 (8th Cir.1990) (Heaney, J., dissenting) (reasoning that the Guidelines' limitations on a court's traditional sentencing authority "are fundamentally unfair and a violation of due process"). *See also United States v. Roberts,* 726 F.Supp. 1359, 1365–68 (D.D.C.1989), *rev'd sub nom. United States v. Doe,* 934 F.2d 353 (D.C.Cir.1991) (holding that the Guidelines "effect substantial violations of due process" on defendants and are thus unconstitutional due to exercise of "key sentencing responsibility ... not by a judge but by the prosecuting attorney"), and *United States v. Brittman,* 687 F.Supp. 1329, 1355 (E.D.Ark.1988), *aff'd in part,* 872 F.2d 827 (8th Cir.1989) (holding that the sphere of sentencing discretion is "properly judicial in nature" in order to comport with due process requirements).

Notice to the defendant and imposition of sentence by an unbiased judge rather than control by a party litigant are crucial procedural elements of due process. These indispensable elements are now absent from the sentencing system under the Court's holding that the relevant conduct provisions of the Guidelines should be interpreted as treating convicted and unconvicted conduct the same.

### A. Control of Sentence by Prosecutor

The Supreme Court held in *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), that the sentencing process may not be placed under the control of a party in interest to the litigation. In *Tumey* Ohio law placed town mayors in control of criminal prosecution for possession of liquor in violation of prohibition laws. Mayors and their cities were given a personal financial stake in the outcome of these particular cases. The Court held in *Tumey* that due process forbids a party in interest from being substituted for the judge in imposing fines and sentences, so that it violates fundamental principles to allow a party in interest to control the sentencing process. 273 U.S. at 531, 47 S.Ct. at 444. *See also Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (holding defendants' due process rights to have been violated by a statutory scheme that paid justices of the peace for each search warrant issued); *In re Murchison,* 349 U.S. 133, 139, 75 S.Ct. 623, 627, 99 L.Ed. 942 (1955) (holding due process violated by allowing judge, who had acted as one-person grand jury, to pass sentence on charge stemming from the initial grand jury hearing); and Note, *Procedural Due Process at Judicial Sentencing for Felony,* 81 Harv.L.Rev. 821, 837 (1968). Impartial justice requires no less than visible control of the sentencing process by an impartial participant—heretofore considered to be the role of the judiciary—to comport with traditional notions of due process. The relevant conduct provisions are a disaster for Guidelines that purport to reduce disparity because these provisions impose a disparate sentencing system based on prosecutorial discretion but conceal the prosecutor's role from the public.

### B. Notice

A sentencing system that institutes punishment for uncharged, unconvicted crimes based on uncross-examined hearsay also violates the notice principle of due process. The prosecutor makes up the crimes for which a sentence will be imposed *after* the defendant has been required to plead guilty or not guilty, as in the cases here. It is impossible for the defendant to know at this critical stage in the proceeding what unconvicted crimes he may be sentenced for. The Criminal Rules Committee of the Judicial Conference, in drafting its 1989 amendment to Rule 11 of the Federal Rules

of Criminal Procedure, recognized the problem that the Guidelines created in this respect. The Committee noted that under the Guideline system, "[t]he advice that the court is required to give cannot guarantee that a defendant who pleads guilty will not later claim a lack of understanding as to the importance of guidelines at the time of the plea. No advice is likely to serve as a complete protection against post-plea claims of ignorance or confusion." Fed. R.Crim.P. 11 advisory committee's note (1989 amendment). The Committee made this statement because it is impossible for the court to give the defendant notice of the unconvicted crimes for which he will be sentenced under the Guideline system conceived by the Sentencing Commission and approved by our Court. According to the procedure now used, a defendant will not be accurately informed of the specific unconvicted crimes charged against him until after the probation officer's presentence report issues. The indictment and the arraignment merely open the game of defining the crime. *See, e.g., United States v. Harrington*, 947 F.2d 956, 964 (D.C.Cir. 1991) (Edwards, J., concurring) ("Assistant U.S. Attorneys ... have been heard to say, with open candor, that there are many 'games to be played'," in indicting defendants and in plea bargaining). The game will later be played out when the prosecution turns over to the probation officer its handpicked list of the uncharged crimes for which it wants the defendant to be sentenced. The prosecutor's office will draw up the charges for which the defendant will actually be sentenced after indictment, plea, and conviction, and then turn this list over to the court through the probation office. *See generally Report of the Federal Courts Study Committee* at 138 (Apr. 2, 1990) (commenting that this system distorts the role of probation officers and recommending greater examination of the effects of the Guidelines sentencing upon the probation system); Note, Steve Y. Koh, *Reestablishing the Federal Judge's Role in Sentencing*, 101 Yale L.J. 1109, 1120–21 (1992) (addressing probation officer's inability to curb prosecutorial gamesmanship in preparing presentencing reports); Hea-

ney, *Guidelines Sentencing*, at 172–75 (noting that "the most striking features of the process are the probation officer's reliance on the government's files for his findings of fact, and, in turn, the court's reliance on the [presentence report's] conclusions and guidelines recommendation," despite the probation officer's inability to attend the trial or to have access to the trial transcript); and Note, 81 Harv.L.Rev. at 837 (recognizing that sentencing information needed by probation officers is frequently under control of prosecutors, "who cannot be expected to be disinterested").

Allowing a defendant to be sentenced in this way for convicted and unconvicted crimes violates the Sixth Amendment provision requiring that the accused be "informed of the nature and cause of the accusation" at the critical stages of the case. Sentencing is just such a critical stage. *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). The requirement that defendants receive fair notice as a matter of due process under the Fifth Amendment and this comparable provision of the Sixth Amendment is fundamental. In *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948), a unanimous Court observed, "No principle of due process is more clearly established than the notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding, in all courts, state or federal."

The Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), applied these same principles to a state sentencing system. It held the Iowa system of parole revocation invalid under the Due Process Clause. In *Morrissey* the accused was reincarcerated by the state parole board for violating conditions of parole. The parole officer controlled this outcome because the process deferred in large measure to his recommendation and allegations of misconduct. The accused was not allowed to cross-examine the witnesses and was not given notice of the allegations and evidence against him at

the critical stage of the proceeding that led to his reincarceration. In reviewing the fairness of such sentencing systems under the Due Process Clause, the Supreme Court in *Morrissey* applied a flexible standard:

It has been said so often by this Court and others as to not require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by government action."

408 U.S. at 481, 92 S.Ct. at 2600 (citations omitted). Applying this standard, the Court held that the parole revocation system in question violated due process by allowing the parole officer to control the process, although the official action was taken in the name of the state parole board, by failing to give adequate notice of the nature of the risks to the accused, and by refusing to allow the parolee to cross-examine the witnesses against him. The "relevant conduct" system under review here suffers the same constitutional defect.

## V. Conclusion

Under the present formulation of the "relevant conduct" system, this Court, the Department of Justice, and the Sentencing Commission have eliminated the normal constitutional protections afforded an accused. The separation-of-powers principle that an Article III court should control the criminal sentencing proceeding as a constitutional "case or controversy" is avoided because the court is bound to sentence the defendant on the basis of the information forwarded by the prosecutor after the plea or verdict. The sentencing grid takes over and mechanically controls the court's decision. The judge is only the nominal sentencer. Control of the sentence is thereby vested in the person who produces the new information about unconvicted crimes to be plugged into the grid, namely, the prosecutor. The court may not alter the sentence based on pleas of the defendant or even pleas of the victim concerning the need for deterrence and retribution and the probability of rehabilitation. As formulated, the relevant conduct system does not allow the trial judge to consider the first principle of sentencing that Congress established in § 3553(a), that the judge may not impose on the defendant a sentence "greater than necessary" to deter or rehabilitate. Such considerations are eliminated by the sentencing grid. The Fifth Amendment constitutional requirement to give notice to the accused of the crimes charged by "presentment or indictment" is eliminated, as is the Sixth Amendment's requirement that the accused be "informed of the nature and cause of the accusation" and, as here, "shall enjoy the right ... to be confronted with the witnesses against him." The prosecutor submits the new crimes information in hearsay form after the plea or verdict. The constitutional and statutory rules requiring reliable evidence are eliminated, and hearsay three and four levels deep, as in these cases, is routinely used as evidence of the new crimes. *See* Heaney, *Guidelines Sentencing*, at 210 & 223–24. The court routinely instructs accused persons to appear before the probation officer, sometimes with the prosecutor or his delegate present, for the purpose of incriminating themselves on the new charges. *See, e.g., United States v. Miller*, 910 F.2d 1321, 1323 & 1329–33 (6th Cir.1990) (Merritt, C.J., dissenting) (trial court seriously misled the defendant into making statements that added more than three years to his sentence).

Thus, the system of relevant conduct as formulated tends to take over the entire sentencing process, displacing the original base offense level for the crime charged and convicted and replacing it with much greater offense levels for the new unconvicted crimes. This usually has the effect of increasing the sentencing several fold by placing the system under the control of the prosecutor, by eliminating the judgment of the trial judge, and thereby eliminating the need for the prosecutor to observe the numerous constitutional safeguards which otherwise attach to the criminal process.

The result is a constitutionally infirm procedure that is effectively shielded from judicial review.

APPENDIX

EXTRACT OF PRESENTENCE REPORT, *UNITED STATES v. SILVERMAN,*

No. CR-2-88-028 (S.D. Ohio, July 12, 1988)

Part A. THE OFFENSE

. . . .

*The Offense Conduct*

4. Ira Silverman was the subject of two separate investigations conducted by the Drug Enforcement Administration (Columbus Branch)/Columbus Police Department and the Ohio Bureau of Criminal Identification–Investigative Division. Information obtained from these law enforcement agencies and the DEA in Cincinnati, Ohio, revealed that Silverman was developed as a suspect in drug distribution activities in Meigs, Athens and Franklin Counties as early as the summer of 1987. According to the DEA (Columbus Branch) and the BCI Investigative Division, Silverman was considered a multi kilo cocaine distributor in Central Ohio based on information provided by confidential informants used in each of the investigations.

5. On October 28, 1987, DEA Agents in Columbus, Ohio debriefed their confidential informant regarding drug distribution activities. The informant advised that Silverman was the head of a cocaine trafficking organization that distributed kilos of cocaine on a monthly basis in Columbus and Athens, Ohio. Further, the informant admitted that he met Silverman during the summer of 1987 and began selling quantities of drugs for him shortly thereafter. The informant advised agents that Silverman supplied cocaine to various individuals who further distributed the drugs in Meigs County and The Ohio State University and Ohio University campus areas. According to the informant, these individuals sold between two and eight ounces of cocaine on a weekly basis. The informant advised the DEA case agent that in August of 1987, Silverman supplied the informant and an unindicted co-conspirator with one kilo of cocaine which was to be sold to them. According to the informant, he and the unindicted co-conspirator had never distributed such a large quantity of cocaine. They proceeded to "front out" the cocaine and quickly became in debt to Silverman. The DEA agent and the informant would be willing to testify to the one kilo transaction and associated activities involving Silverman if requested to do so by the Court.

6. The Ohio Bureau of Criminal Identification–Investigative Division received information in 1987 involving drug distribution activities in which Silverman was involved. According to the BCI case agent, an investigation began after the Athens Police Department and Ohio University Security contacted him regarding the belief that Silverman distributed cocaine on the Ohio University Campus.

7. A Captain on the Athens Police Department was interviewed during the presentence investigative process regarding his knowledge of the defendant. According to the Captain, the Athens Police Department had compiled intelligence information pertaining to Silverman's drug distribution activities in the Central Ohio area. In August of 1987, the Athens Police Department interviewed one of their informants who advised that Silverman transported shipments of cocaine from the State of New York to Ohio on a bimonthly basis. The informant specified that Silverman transported approximately two pounds of cocaine to the Columbus area and approximately two pounds to the Cincinnati area. According to the Athens Police Department, the informants' statements substantiated the information compiled in the intelligence file regarding Silverman's activities. The Captain of the Athens Police Department indicated that he would be willing to testify to the truthfulness of the aforementioned investigation if required to do so by the Court.

8. During the BCI investigation, the same confidential informant used by the Athens Police Department specified to agents that Silverman was a large volume distributor of cocaine in Central Ohio.

9. Drug Enforcement Administration agents in Cincinnati, Ohio obtained information in September of 1987 pertaining to Silverman's drug distribution activities. According to the agents, a female defendant charged federally with possession of cocaine discussed her knowledge of Silverman with a cellmate. On September 2, 1987, the cellmate telephonically contacted the DEA and advised them of the information supplied to her by the female defendant. According to the cellmate, the inmate advised that she had been previously involved with a cocaine distributor based in Miami, Florida. She indicated that she had met an individual named Ira Silverman who had promised her more decision making freedom regarding cocaine distribution. The cellmate indicated that Silverman resided in an apartment complex (West Green) near the Ohio University Campus and had a previous carrying concealed weapon conviction. Further, she advised that Silverman brought cocaine through the Columbus International Airport and distributed kilogram volumes in Athens and Meigs Counties. At a later date, DEA agents in Cincinnati, Ohio attempted to interview the inmate based on the information provided by her cellmate, but she denied that she knew Ira Silverman. It should be noted that DEA agents in Cincinnati have indicated that they would be willing to testify to the truthfulness of this information if requested to do so by the Court.

10. According to the DEA case agent in Columbus, their investigation was initially targeted at individuals who allegedly worked for Silverman as drug distributors. From October 1987 to February 1988, DEA agents, Detectives from the Columbus Police Department and the confidential informant discussed the drug related operations in which Silverman and two unindicted co-conspirators were involved in. On November 11, 1987, the confidential informant made a controlled buy of one-eighth of an ounce of cocaine from one of the unindicted co-conspirators. The cocaine was purchased for $260 in City recorded funds and laboratory tests reveal that the net weight of the cocaine was 3.36 grams with a purity level of 93%.

11. On February 14, 1988, the confidential informant spoke with one of the unindicted co-conspirators and advised that he wished to purchase one-fourth of an ounce of cocaine. On the following day, the informant spoke with narcotic detectives at which time he was given $260 in City recorded funds and instructed to purchase one-eighth of an ounce of cocaine. Upon his arrival at the residence, the unindicted co-conspirator advised the informant that the cocaine transaction could not be completed until Silverman arrived because he was in possession of the cocaine. The informant left the residence and spoke with detectives regarding the fact that Silverman was in possession of cocaine. The informant returned to the residence and met with Silverman. According to the informant, he gave Silverman the $260 for the cocaine but Silverman kept the money and did not complete the transaction. According to the information, Silverman kept the money and applied it to a debt owed by the informant. The informant proceeded to leave the residence and advised detectives that one of the unindicted co-conspirators had advised him that Silverman was in possession of at least two ounces of cocaine. The detectives followed Silverman who was being chauffered in a white Lincoln Town Car limousine. Detectives proceeded to stop the automobile and transported the limo driver, Silverman and an unindicted co-conspirator to Police Headquarters until a search warrant could be obtained.

12. A search of the limousine revealed a bag of white powder which was inside a black gym bag. Laboratory tests revealed that the powder was cocaine with a net weight of 52.9 grams. The purity

level of the cocaine was 93%. In addition, officers confiscated a list of names on a notebook and a number of tapes which contained tape recordings of telephone conversations between Silverman and various individuals. The DEA case agent indicated that the list of names was written by Silverman and represented individuals who distributed drugs for him throughout Central Ohio. This information was substantiated by the DEA case agent through contacts with the Meigs County Sheriff's Office.

13. On February 15, 1988, detectives interviewed the limousine driver who was hired by Silverman to transport him to various places during the day. The driver indicated that he drove to 2280 Muirwood and was met by Silverman. The defendant advised the driver that he would need the limousine for approximately five hours and that he had errands to run in Columbus, Ohio and needed to travel to Ohio University in Athens. Silverman paid the driver $175 in cash. The driver recalled that as Silverman exited the apartment, he carried a black, nylon duffle bag. The limo driver offered to put the bag in the trunk but Silverman declined and kept the bag with him in the passenger compartment of the limo.

14. On the date of the arrest, one of the individuals arrested expressed a willingness to cooperate with Police and signed a consent to search his residence at 2280 Muirwood Drive. The individual advised that a quantity of marijuana was present at the home and that Silverman had a key to the home and stored various things at the house. The individual admitted that among the items stored at his home was approximately ten to twenty sticks of dynamite stored in a safe in the bedroom. The Columbus Fire Department Bomb Squad was contacted in order to secure the explosives. Narcotic Detectives confiscated three pounds of marijuana and a set of scales in addition to a semi-automatic handgun.

15. Ira Silverman is considered highly culpable regarding his involvement in the instant offense and associated drug related activities. As previously indicated in Paragraph 8, DEA received information from an informant that Silverman is an organizer of a cocaine distribution network. The DEA case agent confirmed that the investigation involved Silverman and approximately five additional individuals who distributed cocaine for him. As it relates to the instant offense, Silverman appears to be culpable due to the fact that he was in possession of the fifty-three grams of cocaine and was an active participant in the foiled transaction with the confidential informant. Silverman kept the City recorded funds and decided not to sell drugs to the informant.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

I join in Chief Judge Merritt's dissenting opinion; however, I also write separately to set forth a few additional observations. I believe the majority has selected a standard of proof in relevant conduct analysis that shows little respect for individual liberties. Even if I accepted the use of a preponderance of the evidence standard in relevant conduct analysis, I would still dissent in this case because the majority has failed to apply the standard faithfully. The evidence used to increase Silverman's sentence was insufficient to prove that, more likely than not, Silverman engaged in additional criminal conduct. Although a jury may have found Silverman guilty of numerous offenses, he at least deserves to be sentenced based on evidence that is reliable; he should not be sentenced on evidence that is nothing more than triple hearsay. Any rational sentencing system should require that evidence used for sentencing must be verified through accurate and reliable sources.

A more fundamental problem with the majority's analysis is the adoption of the preponderance of evidence standard in relevant conduct analysis. Judge William W. Wilkins, Jr., who is chairperson of the U.S. Sentencing Commission, recently referred to the relevant conduct provision as the "cornerstone" of the federal sentencing

guidelines. *See* William W. Wilkins, Jr., *Relevant Conduct: The Cornerstone of the Sentencing Guidelines*, 41 S.C.L.Rev. 495 (1990). Although this assertion may be true, the majority has contorted the "cornerstone" of the sentencing guidelines to allow the government to use the preponderance of the evidence standard to convict defendants of uncharged criminal activity.

Any justice system must delineate what burden or standard of proof applies in litigation. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). The standard of proof serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision. *Id.* In many aspects of civil litigation, society has long allowed the use of the preponderance of the evidence standard. Under such a standard, the risk of error is marginally on the plaintiff and he need only show that, more likely than not, he is correct. However, in the criminal justice system, which is a system under which a criminal defendant could be deprived of his liberty, society has required the use of the reasonable doubt standard. This standard of proof "reflects the value society places on individual liberty." *Id.*, 441 U.S. at 425, 99 S.Ct. at 1809. Under such a standard, the risk of error is almost entirely on the government. Today, the majority has endorsed a system under which the government can convict a defendant of uncharged criminal conduct by simply demonstrating to the court that, more likely than not, the defendant has engaged in the criminal activity. Thus, the majority has proclaimed to society just how little the federal courts value an individual's liberty. This is not a proclamation that we need to issue to a society in which millions of Americans already strongly question the fairness and legitimacy of the criminal justice system.

The amalgam of the relevant conduct provision and the preponderance of the evidence standard presents one additional problem: the opportunity for abuse. What appears to be happening in guidelines cases is that the government goes to trial and proves the charged criminal activity beyond a reasonable doubt and then, at sentencing, the government proves additional uncharged criminal activity by a preponderance of the evidence. The final result is that the defendant ends up with a sentence that has been substantially increased because of the uncharged criminal activity. Even more troubling is the government's use of acquitted conduct to serve as the basis of enhancing a defendant's sentence. *See United States v. Moreno*, 933 F.2d 362, 473 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991) (an acquittal does not bar a sentencing court from considering the acquitted conduct in imposing a sentence). A defendant who has been acquitted of some criminal activity but convicted of other criminal activity has won only a pyrrhic victory because when the defendant appears in the courtroom at sentencing he finds the acquitted activity riding on the back of the convicted activity.

There are likely few things harder to admit than that as a judge you are wrong. I now, however, see the error of my early endorsement of the goals of the guidelines. At the time I wrote *United States v. Perez*, 871 F.2d 45 (6th Cir.1989), which was my first encounter with the federal sentencing guidelines, I firmly believed that the guidelines could elevate the federal criminal justice system to a new level. I even supported Judge Stephen Breyer's argument, which he made in the Hofstra Law Review, that many compromises were made in the implementation of the sentencing guidelines, but that a better system would emerge. *See* Stephen Breyer, *The Federal Guidelines and the Key Compromises Upon Which they Rest*, 17 Hofstra L.Rev. 405 (1988). I now believe I was wrong in endorsing the guidelines. The guidelines,

as ambitious as they were, have become more than just guidelines; they are rigid mandates. I still believe that sentencing throughout the federal system should be as uniform as possible. However, the guidelines disregard fundamental notions of due process and create a slip-shod system of sentencing in which the only thing that matters is the maximization of prison sentences. "The best we can say about [the sentencing guidelines] is what Herbert Hoover said of Prohibition: that this has been a 'great ... experiment, noble in motive [and] far-reaching in purpose.' But like that earlier experiment, this one has failed." Jose A. Cabranes, *A Failed Utopian Experiment*, Nat.L.J., July 27, 1992, at 17, 18 (U.S. District Judge Cabranes based the article on a speech he delivered at the University of Chicago). As with any failed experiment, it is now time that we rid ourselves of the experiment and move on to a new, improved system.

In this case, of course, we are not faced with the question of whether Congress should eliminate the sentencing guidelines. We are faced with the more narrow question of the proper application of the relevant conduct provision. On this question, I believe Chief Judge Merritt, as well as the dissenters in *United States v. Restrepo*, 946 F.2d 654 (9th Cir.1991) (en banc), have made strong arguments in favor of rejecting the preponderance of the evidence standard in many areas of guidelines sentencing and adopting the reasonable doubt standard, and I urge the majority and other courts to seriously consider these arguments. I find the arguments well-reasoned and thoroughly persuasive; hence, I must respectfully dissent from the majority's opinion.