NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0220n.06

No. 23-1700

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| ANTHONY TURNER, | ) ) | |
| Defendant-Appellee. | ) ) | OPINION |
|  | ) | |

FILED
May 17, 2024
KELLY L. STEPHENS, Clerk

Before: BOGGS, KETHLEDGE, and MURPHY, Circuit Judges.

BOGGS, Circuit Judge. Anthony Turner was indicted on one count of accessing with intent to view child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). He pleaded guilty. The initial presentence report (PSR) included a five-level enhancement for a "pattern of activity involving the sexual abuse of a minor," pursuant to U.S.S.G. § 2G2.2(b)(5).

The enhancement was rooted in allegations of sexual abuse made by Turner's minor nieces. These allegations were investigated and resulted in Michigan criminal charges against Turner, which were later dismissed when his then eight-year-old niece refused to testify against her uncle. Turner objected to the pattern-of-activity enhancement. A final PSR included the enhancement, and calculated Turner's offense level at 33 and his Criminal History Category as I. Accordingly, this enhancement resulted in an advisory Guidelines range of 135-168 months in prison. The district court sentenced Turner to 135 months in prison followed by five years of supervised release.

Turner now appeals the district court's application of U.S.S.G. § 2G2.2(b)(5), arguing that the district court clearly erred in applying the five-level pattern-of-activity enhancement and violated his constitutional rights. We affirm the district court's judgment.

## I. BACKGROUND

A. 18 U.S.C. § 2252A(a)(5)(B), (b)(2)—Access with Intent to View Child Pornography

In May 2022, a network security contractor notified the Department of Defense Criminal Investigative Service (DCIS) that an employee of the Defense Logistics Agency (DLA) was searching for and viewing child pornography through Department of Defense networks. The username of the employee was "anthony.e.turner23.civ." Investigators determined that the username belonged to Anthony Turner. At that time, DCIS learned that Turner had been under investigation by the DLA Office of the Inspector General (OIG) since November 2021 for viewing adult pornography and for potentially viewing child pornography on his DLA-owned laptop.

In June 2022, a search warrant was issued for Turner's government issued laptop, his residence, and his person. He acknowledged, in an interview after *Miranda* warnings, that he searched for "topic links" and that the searches returned images that were "young" but did not provide a specific age. He also acknowledged that the images were "not good . . . I'd definitely call it hardcore" and admitted that there would be child sexual abuse material (CSAM) on his government-issued computer.

Investigators located 1,935 images of child pornography on Turner's government-issued laptop; there was an indication that the images were either downloaded to the computer or were displayed on the screen at some point. The images were accessed during a seven-month period, from May 2021 to December 2021. Investigators determined that the images located on the

computer contained known victims of CSAM as identified by the National Center for Missing and Exploited Children and were egregious and graphic in nature.

In February 2023, a grand jury indicted Turner for accessing child pornography with intent to view it, pursuant to 18 U.S.C. § 2252A(a)(5)(B), (b)(2). In April 2023, Turner pled guilty to the charge pursuant to a plea agreement.

B. U.S.S.G. § 2G2.2(b)(5)—Pattern of Sexual Activity Involving the Sexual Abuse or Exploitation of Minors

The probation officer prepared a PSR, recommending that Turner receive a five-level sentence enhancement for engaging in a pattern of activity involving the sexual abuse of minors. The PSR based this enhancement on a 2013 case that charged Turner with Criminal Sexual Conduct in the First Degree under Michigan law. The case, however, was ultimately dismissed because the victim, Turner's then eight-year-old niece J.S., declined to testify against her uncle.

Turner objected to the five-level enhancement, arguing that the allegations against him resulted in a dismissal, not a conviction. He also argued that there was no sworn testimony against him, that he took two inconclusive polygraph tests, and that the allegations were "separated in time, space, and subject matter" from the current federal case and that "[a]ny alleged pattern of activity of sexual abuse of a minor has no connection to this case and is not supported by any finding of fact." The United States then filed a 32-page sentencing memorandum that supported the enhancement and outlined the sexual-abuse allegations made by his young nieces.

*1. United States Sentencing Memorandum*

On July 15, 2013, a then seven-year-old J.S. told her mother that she was tired of "Uncle Tony touching her." J.S. explained that Uncle Tony showed her his private parts. When asked what

Uncle Tony would do next, J.S. made a stroking motion with her hands. When asked if Uncle Tony has ever put his private parts inside of her, J.S. said "he has and I want it to stop."

On July 16, 2013, J.S. was taken to Community Health Center Emergency Room to be examined by the Sexual Assault Nurse Examiner (SANE). Before her SANE examination, J.S. was interviewed by police officer, Robin Swartz. J.S. told the same story to this officer with more detail.

When asked by Officer Swartz why she was here today, J.S. said that "people are going to check my crotch because my Uncle Tony has been rubbing my crotch." She then said, without prompting, that "he also puts his wiener in my crotch." J.S. then told Officer Swartz that she did something bad and motioned her hand up and down in a stroking motion "to his wiener" which she did because "Uncle Tony told [her] to." She also noted that "Uncle Tony puts his wiener on me." J.S. told Officer Swartz that she was "sick of Uncle Tony doing this," so she told her mother yesterday. When asked the last time it happened, she said that "yesterday he did this and [he said] maybe we should do this tomorrow." When asked when it started happening, J.S. said it has been going on for a year. When asked by Officer Swartz to tell her again what Uncle Tony does to her, J.S. said "he rubs my crotch, I rub his wiener, and he puts his wiener in my crotch." When asked by Officer Swartz to describe what Uncle Tony does, she said that he "pulls my pant and underwear down" to just above her knee and "he then rubs my crotch." J.S. told Officer Swartz that "he just unbuttons his pants and takes his wiener out" and when somebody comes, he buttons his pants and pulls J.S.'s pants back up. When asked where this occurred, J.S. said that it was always at her grandmother's home in "[J.B.]'s room." J.S. further explained that J.B. is her cousin.

Officer Swartz then interviewed J.S.'s parents. J.S.'s mother told Officer Swartz that J.S. approached them last night, wanting to tell them something. J.S. then told her mother that "Uncle

Tony touched me in my crotch." J.S.'s mother then approached her husband, J.S.'s father, and J.S. told him that Uncle Tony had shown her his "wiener." When her father asked J.S. whether Uncle Tony ever put it in her mouth, J.S. said no but that he "put it in me." J.S.'s father told Officer Swartz that he talked with her again that morning and she told him the very same thing— "she didn't change her story at all." When asked by her father if someone had told her to say this, J.S. replied that Uncle Tony told her not to say anything or that he would go to jail.

Before she was examined by Nurse Laura Kopacz, the nurse interviewed J.S.'s parents and J.S. separately. J.S.'s father related the same story to Nurse Kopacz—that J.S. was at her grandmother's house last night, told her parents that "Uncle Tony was touching me in the crotch," "put his wiener in [her]," and made her touch his penis, and that "Uncle Tony said not to tell or he would go to jail." Next, Nurse Kopacz interviewed J.S. who indicated that "Uncle Tony touches me in the crotch and I want it to stop and he makes me touch him." Nurse Kopacz reported a normal examination but explained to J.S.'s parents that "a normal examination does not always mean that nothing has happened, only that there were no injuries observed at this time."

On July 22, 2013, when Officer Swartz returned to work, there was a voice mail message from Brett Shotzman. When Officer Swartz called him back, Shotzman said that his daughter, J.B., had disclosed to him that Uncle Tony had been "touching" her as well. Shotzman told Officer Swartz that he asked her "has someone been touching you too?" J.B. then began to tear up and nodded and he took her to another room where he asked her "who? Uncle Tony?" to which she nodded again. Shotzman then asked J.B. what he did to her, and she told him that "he used his hand," and that it happened when she was in the third grade at her grandparents' home when Uncle Tony had been watching over her and her brother. Shotzman then agreed to bring J.B. to the police department for an interview with Officer Swartz.

Officer Swartz interviewed J.B. When asked why she was there and what she had told her father, J.B. told Officer Swartz that "it was at her Grandma and Grandpa's home," and "always" occurred when Uncle Tony was watching her and her brother. She then told Officer Swartz that she was in the third grade and that she had told her mother about it at the time. When asked what all this was referring to, J.B. said that Uncle Tony "used to touch me" and when asked to elaborate further she teared up and did not speak for several moments. When Officer Swartz asked again what she had meant, J.B. said that Uncle Tony "used to touch her where she did not want to be touched." When asked where that was, J.B. said "on my vagina with his hand." When Officer Swartz asked if it was under her clothes, she said yes and, when asked if he took her clothes off, she said she did not remember. J.B. then got emotional and Officer Swartz gave her a break to compose herself.

When Officer Swartz came back, she asked J.B. if anything happened to her brother that she had witnessed herself. J.B. nodded and began to tear up again before telling Officer Swartz that Uncle Tony "did it to [her brother] like he did [to] me" and that she had seen it happen once when they were both standing. When Uncle Tony saw that J.B. observed this, J.B. said that Uncle Tony "acted like he was joking around, because he was laughing while he did it." Officer Swartz then asked J.B. how she knew he was not joking around to which J.B. replied that he would "do it over and over again." J.B. then told Officer Swartz that Uncle Tony had shown her his penis, but she couldn't remember anything else.

Officer Swartz then telephoned Rebecca Butters, the mother of J.B. and her brother. Officer Swartz told Butters of her conversation with J.B. and asked Butters if J.B. had told her anything like this. Butters told Officer Swartz that J.B. had said something to her and her mother one time and that some people had come to J.B.'s school, so they were talking about it. Butters then went

on and said that both J.B. and her brother had told her that Uncle Tony had "touched them" and that J.B. had said that her brother or Tony had pulled her pants down. Butters noted that both children presented it like a "joke" and when she said she was going to confront Tony both children told her not to. Both children tried to justify Uncle Tony's behavior, noting that he "was just kidding around," after which Butters spoke to them about how this was not a proper way to kid around.

Approximately two weeks after her initial disclosure, on July 25, 2013, J.S. and her cousin, J.B., were interviewed at the Child Advocacy Center in Marshall, Michigan, by Forensic Interview Specialist Brenda Lamica about their allegations against Turner.

J.S.'s story remained the same as she told Officer Swartz. In this interview, however, J.S. recalled an additional detail. J.S. mentioned to Specialist Lamica that "when she rubs Tony's wiener it 'leaks a little.'" When it happens, J.S. said that he wipes the "clear" leak off.

In J.B.'s interview, she also recalled additional details. During the interview, J.B. disclosed that Uncle Tony touched her private parts under her clothes and underwear and indicated to Specialist Lamica that Uncle Tony "had touched [her] 'hole' with his hand." Additionally, J.S. described that Uncle Tony had sat on her when she was lying in bed and moved "back and forth." J.S. then specified which part of his body was moving back and forth to Specialist Lamica by making a circle around the hip area. J.S. also disclosed that she had seen Uncle Tony touch her cousin, J.B.'s brother, "where he pees" and thought that Uncle Tony had touched J.B.'s brother more than once because J.B.'s brother told his mother about it.

J.B.'s brother was interviewed by Specialist Lamica and did not disclose any assaults. When asked by Specialist Lamica to name his family members, he did. When Specialist Lamica asked if any of the family members he listed would be "concerned," he said that Uncle Tony would.

He did not disclose to Specialist Lamica why he said this. J.B.'s brother was also interviewed by Officer Swartz. The interview with Officer Swartz also did not disclose any assaults. Officer Swartz noted, however, that the then-ten-year-old was emotional and fearful that he would get in trouble during their interview.

Turner submitted to two polygraph examinations, where he was asked about J.S.'s and J.B.'s allegations. The examinations resulted in inconclusive outcomes. As a result of the investigation, the Branch County prosecutor charged Turner with three counts of criminal sexual conduct. Ultimately, the case against Turner was dismissed when J.S., then eight years old, declined to testify against her uncle.

### 2. *Enhancement Imposition*

In July 2023, a sentencing hearing was held before District Judge Jane M. Beckering. The Judge noted that Anthony Turner objected to the five-level enhancement pursuant to U.S.S.G. § 2G2.2(b)(2), and the government then called a witness to testify in support of the enhancement—Officer Robin Swartz.

Officer Swartz testified to the investigation she conducted into Turner, including the interviews she conducted with J.S., J.B., and J.B.'s brother, the SANE interview and examination of J.S. conducted by Nurse Laura Kopacz, and the forensic interviews of the three children conducted by Forensic Interview Specialist Brenda Lamica at the Child Advocacy Center. Officer Swartz testified that she had investigated hundreds of child sexual conduct cases over the course of her career and recounted her investigation as outlined in her police report in the United States's Sentencing Memorandum. She testified that she initially believed J.S. because "it's hard to imagine that a 7-year-old could come up with that as detailed as she did." Officer Swartz noted that she was told by the SANE nurse that J.S. advised the nurse "in detail the same thing." Officer Swartz

then noted that J.S.'s forensic interview by Forensic Interview Specialist Lamica at the Child Advocacy Center yielded "the same detailed story." Officer Swartz added that J.S. was thought to be "very believable by all parties" that interviewed her.

Officer Swartz then recounted J.B.'s allegations against Turner. She disclosed that J.B. was about 12 years old when interviewed about her abuse that occurred when she was in third grade. Officer Swartz noted that she "believe[d] [J.B.] was being honest," "seemed articulate," and "she was confident in what she was saying." Officer Swartz also said that J.B. told the same story at the Child Advocacy Center, albeit with more detail.

At the conclusion of Officer Swartz's testimony, when asked one last question about anything else about the investigation that would be helpful for the court to know, she said:

> I believe that—just that I believe—I've interviewed a lot of children over my career and [J.S.] came off as a very articulate young lady and the credibility with saying the same statement to me and to the SANE nurse and in the forensic interview, I just—they were believable. I can't think of another word that more accurately describes it, especially [J.S.] was very believable.

After hearing from Officer Swartz, the district court overruled Turner's objection to the five-level enhancement and held that the pattern-of-activity enhancement would be properly applied in this case.

The district court noted that the abuse was "specific, consistently reported, and corroborated." The allegations against Turner were specific as to the descriptions of the abuse—Turner "forced the victims to rub his penis, . . . touch[ed] their nude genitalia, and . . . engage[d] in sexual intercourse with them"—and the geographical location of the abuse—J.B.'s and J.S.'s grandparents' home. Additionally, the court noted that J.S. also described the room in which the abuse occurred. The court reasoned that the allegations of abuse against Turner were also consistent—J.S. described the same sexual abuse to her parents, a police officer, and two weeks

later to a Forensic Interview Specialist at the Child Advocacy Center. The court also noted that J.B. also consistently reported the same description of sexual abuse by Turner to her father, to law enforcement, and to the Forensic Interview Specialist at the Child Advocacy Center. Lastly, the court stated that the allegations against Turner were corroborated by other parties—multiple parties verified that the girls were regularly at their grandparents' home when Turner was there, a family member recalled seeing Turner alone with J.S., and that Officer Swartz's testimony also supported this. In sum, the court found the evidence sufficiently credible to apply the U.S.S.G. § 2G2.2(b)(2) enhancement.

At the conclusion of sentencing, Turner was sentenced to 135 months in prison—the lowest sentence within his Guideline range. He now appeals the application of the enhancement, arguing that the district court's factual findings as to the reliability of the allegations and its determination that the allegations supported a finding by a preponderance of the evidence that Turner engaged in a pattern of activity involving the sexual abuse or exploitation of a minor were clear error. Because the district court's factual findings about the pattern-of-activity enhancement were clearly erroneous, he argues, the sentence was procedurally unreasonable. Turner also raises constitutional claims regarding the reliance on hearsay at sentencing and the use of judge-found facts by a preponderance standard to increase his sentencing range.

## II. STANDARD OF REVIEW

This court reviews sentences for procedural reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). A district court's proper application of a sentence enhancement under the Guidelines is a matter of procedural reasonableness. *United States v. Flack*, 392 F. App'x 467, 470 (6th Cir. 2010).

We review the sentencing court's factual findings for clear error and its Guidelines interpretation de novo. *United States v. Paull*, 551 F.3d 516, 526 (6th Cir. 2009). Under clear-error review, a finding is "clearly erroneous" only if the record as a whole leaves the reviewing court with a definite and firm conviction that a mistake has been committed. *Kerman v. C.I.R.*, 713 F.3d 849, 867 (6th Cir. 2013). Clear-error review is also "highly deferential to the district court." *United States v. Meek*, 32 F.4th 576, 579 (6th Cir. 2022). Thus, the question is whether the factual findings by the district court—that the allegations of sexual abuse of J.S. and J.B. supported the enhancement by a preponderance of the evidence—were clearly erroneous in light of the record as a whole.

Turner seems to concede that clear error is the standard of review to his challenge but appears to misconstrue the standard. This standard of review applies to the whole conclusion, rather than whether the district court's analysis of any factor was clearly erroneous.

A. Application of U.S.S.G. § 2G2.2(b)(5)

For a five-level enhancement pursuant to U.S.S.G. § 2G2.2(b)(5) to apply, Turner must have "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). The commentary to U.S.S.G. § 2G2.2(b)(5) clarifies that a pattern of activity involving the sexual abuse or exploitation of a minor means "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." *Id.* § 2G2.2(b)(5) cmt. n.1. Additionally, "'[s]exual abuse or exploitation' means any of the following: (A) conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)-(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2421, § 2422, or § 2423; (B) an offense under state law, that would have been an offense under such

section if the offense had occurred within special maritime or territorial jurisdiction of the United States; or (C) an attempt or conspiracy to commit any of the offenses under subdivisions (A) or (B)." *Ibid.*

Turner does not dispute that 18 U.S.C. § 2241(c)—aggravated sexual abuse with children—applies to his case. This section states that someone who crosses a state line to engage in a sexual act with another person who has not attained the age of 12 years shall be fined and imprisoned. 18 U.S.C. § 2241(c). A "sexual act," as relevant to Turner's case, includes "contact between the penis and the vulva" with "contact involving the penis occur[ing] upon penetration, however slight," "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person," or "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." *Id.* § 2246(2)(A), (C), (D).

A sentencing court may consider and rely on hearsay evidence when deciding to apply a Guidelines enhancement so long as the information has "some evidentiary basis" to satisfy some "minimal indicium of reliability." *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (citation omitted); *see Paull*, 551 F.3d at 527-28.

In *Paull*, an enhancement under U.S.S.G. § 2G.2(b)(5) was upheld. 551 F.3d at 527. We reasoned that the record contained sufficient evidence to uphold the use of the enhancement because the hearsay evidence was specific and corroborated. *Ibid.* In *Paull*, there was a letter detailing the abuse, including when the activity started and the time of day and year—evenings during football and basketball season, when the victim was isolated from his other family

members—and was corroborated by family members of the victim. Relying on this letter written by a friend of the defendant's son, alleging that the defendant had molested the victim on several occasions around twenty years earlier, the district court found this to be reliable evidence to apply the enhancement. *Ibid*. Explaining its reasoning, this court noted that disputed facts do not make the body of evidence insufficient and affirmed the enhancement application. *Ibid.*

Likewise, in *United States v. Flanigan*, this court upheld the district court's determination and application of the pattern-of-activity enhancement. 2023 WL 3645203, at *4 (6th Cir. May 25, 2023). There, statements made by the defendant's sister, disclosing that the defendant abused her, were considered reliable and her version of the events was credited because it remained unchanged, consistent, and specific over the course of two separate interviews with FBI investigators. *Ibid*. These statements were found to be sufficiently specific—from the time she was four or five to seven years old, the defendant came into her room each night and touched her vagina with his fingers and, on one occasion, penetrated her vagina with his penis. *Id.* at *1. The court credited her allegations even though they were not corroborated by other family members and she had not disclosed the defendant's abuse to anyone in her family until the FBI investigation into the defendant. *Id.* at *4. This court found that the district court did not clearly err in this case. *Ibid*.

*Flanigan* and *Paull* make it clear that allegations of sexual abuse need not be specific, consistent, *and* corroborated. The *Flanigan* court relied on the specificity and consistency of the allegations, not their corroboration, while in *Paull*, this court relied on the specificity and corroboration of the allegations, not their consistency. *Flanigan*, 2023 WL 3645203, at *4; *Paull*, 551 F.3d at 527. Therefore, the question is whether the allegations of sexual abuse are reliable when taken as a whole.

Here, the district court did not clearly err; we have no definite and firm conviction that a mistake had been committed. The specificity, consistency, and corroboration of the allegations made by both girls support this conclusion.

*1. Specificity*

First, the district court considered the allegations made by J.S. and J.B. reliable, in part, because they were specific. The record supports this determination. Both girls described Turner touching their nude genitals and both girls described that Turner engaged in sexual intercourse with them. Likewise, J.S. described Turner forcing her to touch his penis, rubbing her crotch, and penetrating her. J.B. described Turner touching her private parts under her clothes and underwear, including her "hole," and described Turner rocking his hips back and forth against her while on top of her in a bed. These allegations from J.S. and J.B. imply a child describing an adult forcing the child to engage or attempting to engage in sexual intercourse with the child—both are acts that fall under 18 U.S.C. § 2242.

The information provided by J.S. and J.B. was, in fact, more specific than in *Paull* and *Flanigan*. J.S. described Turner sexually assaulting her on at least two different dates and described the sexual assault as always happening in a specific room in her grandparents' home. Likewise, J.S. also recalled that Turner would button his pants and pull hers back up when he heard somebody come when he was abusing her. J.B. also specifically described her abuse by Turner—he began sexually abusing her when she was in the third grade, and the abuse happened when she was at her grandparents' home when Turner had access to her and her brother. Additionally, J.B. noted that she knew Turner was not joking in his abuse— "he would do it over and over again." J.B. also described, in her forensic interview, a specific incident in which she viewed Turner naked and another when Turner was sitting on top of her and rocking his hips back and forth.

*2. Consistency*

Second, the district court considered the allegations made by J.S. and J.B. reliable, in part, because they were consistent. In fact, the allegations of sexual abuse against Turner were more consistently reported than the allegations in *Flanigan*. Indeed, the *Flanigan* court credited the allegations as consistent because they were the same over the course of two interviews—here, J.S. reported Turner's sexual abuse to her parents twice, to Officer Swartz, and to Nurse Kopacz. J.S.'s parents noted that, when J.S. recounted her sexual assault to her parents the second time, "she didn't change her story at all." Officer Swartz also found J.S.'s consistency, in her experience, exceptional—J.S. was consistent in her statements across three different interviews by three different people who investigated this case and, in Officer Swartz's view, J.S. was very "believable." Additionally, J.B. had reported her sexual abuse by Turner to her mother when it happened years before J.S. was sexually abused, but her mother thought that it was a joke and, as a result, Turner was not investigated.

Turner contends that both J.S. and J.B. were inconsistent because they added additional details of their sexual abuse by him as interviews progressed. Turner conflates "inconsistent" and "additional." The details related by J.S. and J.B. in their interviews over time were not inconsistent—that is "lacking in agreement among parts; not compatible with another fact or claim"—but rather were cumulative. *See* Inconsistent, Black's Law Dictionary (11th ed. 2019).

Here, the core of J.S. and J.B.'s allegations—that Turner sexually abused them—remained consistent over time and over interviews with several officials. Turner points to mere nuances in disclosure—J.S.'s description that Anthony Turner put his "wiener *in*" vs. "wiener *on*" her and J.B.'s interchangeable use of the words "crotch," "vagina," and "hole" over the various interviews. Turner also points to J.B.'s account that she had seen Turner sexually abuse her brother "once" vs.

"more than once," and the additional detail that J.S. had seen some clear fluid leak from Turner, made in her Child Advocacy Center interview, that she did not disclose before. Turner claims these are significant inconsistencies, and it was clear error for the district court to conclude that they were consistent. It was not.

*3. Corroboration*

Lastly, the district court considered the allegations made by J.S. and J.B. reliable, in part, because they were corroborative. The abuse described by J.S. and J.B. was very similar—both girls named Turner as their abuser, described similar sexual assaults by Turner, the assaults took place at the same location when Turner was watching them and where he had access to them away from other adults, and occurred when they were of a similar age. The district court noted that the accounts were also corroborated by other parties—multiple people, including the girls' family members, verified that the girls were regularly at their grandparents' home when Turner was there, one person recalled seeing Turner alone with J.S. at the home, and the testimony of Officer Swartz supported these accounts. Thus, the accounts were sufficiently credible and reliable.

Turner contends that similar allegations by two different victims do not corroborate one another and that more corroborative evidence would be needed to find that J.S.'s and J.B.'s allegations of sexual abuse against him are reliable. But the similarities between the accounts of abuse of both girls confirm or make it more certain that Turner was the one who sexually abused them. Indeed, the *Paull* court found that there was corroboration because the victim's family members made statements that supported the victim's allegations. 551 F.3d at 527. Moreover, as Turner points out, each girl had no knowledge about the other's sexual-abuse allegations or had witnessed the other's sexual abuse, further bolstering that their allegations against him are reliable and corroborative.

B. Constitutional Rights & Testimonial Hearsay

Turner raises two constitutional challenges: he argues (1) that judicial factfinding by a preponderance of the evidence to enhance his sentence violated his due-process and jury-trial rights under the Fifth and Sixth Amendments, and (2) that the admission of and reliance on hearsay at sentencing violated the Confrontation Clause. He acknowledges that "the current state of the law in the Sixth Circuit is not consonant with" and "is contrary to his position." Accordingly, he raises these arguments "for an extension, modification, or reversal of existing law in good faith, recognizing some fluidity in the current state of the law and the potential for change in the future."

As noted by Turner, *United States v. Sexton* states that judicial fact-finding by the preponderance of the evidence is permissible at sentencing. 512 F.3d 326, 330 (6th Cir. 2008). So long as the trial court appreciates that the Guidelines are simply advisory, not binding, it is well-established that the preponderance standard does not violate *Booker*. *United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005); *see United States v. Booker*, 543 U.S. 220, 265-67 (2005).

As articulated in *Silverman*, so long as the evidence in the presentence report bears some minimal indicia of reliability, the district court may consider and rely on hearsay evidence without any confrontation requirement. 976 F.2d at 1511. While Turner's argument recognizes some fluidity in the current state of the law, nothing specifically "would cause this Court to reverse its long-settled rule of law that [the] Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings." *United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006). Therefore, we will "continue to observe [our] precedent that testimonial hearsay does not affect a defendant's right to confrontation at sentencing." *Ibid*.

**AFFIRMED.**